FILED
2013 Jul-29  PM 01:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **JOE TAYLOR, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:11-CV-3336-VEH** |
| | ) | |
| **CITY OF GADSDEN, AN** | ) | |
| **ALABAMA MUNICIPAL** | ) | |
| **CORPORATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Joe Taylor, Jeff Mayben, Lecil Harrelson, Jeff Morris, John A. Calvert, David

Putman, and Derreck Sherrill are firefighters employed by the City of Gadsden ("the

City"). They filed this putative class action lawsuit against the City and Gadsden

Mayor, Sherman Guyton, in his official capacity.   The complaint alleges that

mandatory increases to their required pension contributions, imposed by a recent act

of the Alabama Legislature, and resolutions of the City, violate Article I, section 10

of the U.S. Constitution and Section 22 of the Alabama Constitution.  (Doc. 1, p. 1.)[1]

This case comes before the court on  the cross motions for summary judgment

---

[1] A short amendment to the complaint was filed on April 4, 2012.  (Doc. 28.)  However, most of the allegations appear in document 1.  When the court refers to the "complaint" it is referencing document 1.

filed by the defendants (doc. 46) and the plaintiffs (doc. 48). Also before the court is the plaintiffs' motion to strike certain evidence which was submitted in support of the defendants' motion for summary judgment. (Doc. 56.) Finally, although not set out as separate motions to strike, each party has "denied" many factual statements offered by the other in support of the motions for summary judgment. Because most of these denials actually dispute the admissibility of the evidence offered in support of the fact, the court includes a section of this opinion treating those denials also as motions to strike.

For the reasons stated herein, the plaintiffs' motion to strike will be **GRANTED**. The individual denials of facts will be ruled on as noted herein. Finally, the defendants' motion for summary judgment will be **GRANTED**, and the plaintiffs' motion for summary judgment will be **DENIED**.

## I.    STANDARDS

### A.    <u>Motion to Strike</u>

Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. . . ." Fed. R. Civ. P. 12(f). A key limitation in Rule 12(f) is the phrase, "from a pleading." Rule 7(a) lists the pleadings which are allowed in federal court. Fed. R. Civ. P. 7(a). This list does not include a party's brief in support of a

motion, nor does it include an affidavit or portions of a deposition.  Therefore, the Rules do not allow the court to "strike" these documents.

At the same time, federal courts often treat a party's motion to strike certain evidence as an objection to that evidence's admissibility.  *See, e.g.*, *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1333-34 (M.D. Ga. 2007).  Such objections are significant in resolving a motion for summary judgment, because a district court may not consider evidence, at that juncture, which could not be reduced to an admissible form at trial.  *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).

Until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence. Then, the advisory committee added Rule 56(c)(2), which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2).   Although the plaintiffs have filed a Motion to Strike, the motion challenges the admissibility of the affidavit, and portions of a deposition. Therefore, the court will treat the plaintiffs' Motion to Strike as an objection under Rule 56(c)(2).

The advisory committee's note to Rule 56(c)(2) provides that:

> [An] objection [under Rule 56(c)(2)] functions much as an objection at trial . . . .  <u>The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.</u>

Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments (emphasis added).

### B.   <u>Motion for Summary Judgment</u>

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All

reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can

satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955) ("Both parties filed and argued motions for summary judgment, but this does not warrant the granting of either motion if the record reflects

a genuine issue of fact.").[2]  "When there are cross-motions for summary judgment, the court must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *D & H Therapy Associates, LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011); *see also, Byce v. Pruco Life Ins. Co.*, 1:09-CV-1912-RWS, 2011 WL 233390 (N.D. Ga. Jan. 21, 2011) ("[T]he filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law'") (quoting *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 538–39 (5th Cir.2004)).

The court will consider each motion independently, and in accordance with the Rule 56 standard. *See U.S. v. Diebold, Inc.*, 369 U.S. 654, 655  (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.").  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  WRIGHT, MILLER & KANE,

---

[2]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

F ED. P RACTICE & P ROC. § 2720, at 327-28 (3d ed. 1998).

## II.   ANALYSIS

### A.   <u>The Plaintiffs' Motion to Strike (Doc. 56)</u>

The defendants have not responded to the motion, and so have not satisfied their burden to show that the evidence is admissible.  For that reason alone, the motion is due to be granted.  Regardless, as shown below, the material is not admissible.

#### 1.   *The Affidavit of Lisa Rosser*

The plaintiffs argue that "[t]he affidavit of Lisa Rosser . . . is inadmissible hearsay, not based on first hand evidence and does not demonstrate that the affiant is qualified to testify about such matters."  (Doc. 56, p. 2.)  The motion appears to attack the <u>entire</u> affidavit.  While affidavits which fail to meet the standards set forth in Rule 56 may be stricken, "if an affidavit contains some improper material, the court need not strike the entire affidavit, rather it may strike or disregard the improper portions and consider the remainder of the affidavit."  *Thomas v. Alabama Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003).  In this case, however, the entire affidavit is inadmissible.

The affidavit is very short.  Although it is Rosser's affidavit, it begins by saying: "Before me, the undersigned, a Notary Public in and for said County and

State, personally appeared <u>Kenneth and Debbie McElroy</u> . . . who being by me first

duly sworn, deposes and says as follows[.]" (Doc. 47-15, p. 1) (emphasis added).  The

body of the affidavit then reads:

1. According to Governmental Accounting Standards Board (GASB) guidelines for municipalities, a city should have on hand a "reserve fund" or "unassigned funds" an amount equal to three times its monthly operating expenses. We are informed by our auditors that most cities have four-to-six months in their reserve funds.

2. According to the 2013 budget, the City of Gadsden's monthly operating expenses were projected to be just under $3.8 million.

3. Therefore to be within GASB guidelines the City would need to have $11.4 million in its "unassigned funds" line item.

4. As of September 30, 2012, the City's "unassigned funds" balance was about $7.8 million. It had dropped from $10.9 million as of September 30, 2010; and from $9.9 million as of September 30, 2011.

5. GASB promulgates standards and guidelines by which accountants and auditors are governed. These include standards and guidelines for public entities. GASB standards are recognized in the financial industry as setting forth reporting procedures by which public entities should operate.

(Doc. 47-15, pp. 1-2.)  The affidavit is then signed by Lisa Rosser, after which the

following appears:

I, the undersigned, a Notary Public in and for said County and State, hereby certify that Lisa Rosser, whose name is signed to the above and foregoing Affidavit, and who is known to me, acknowledged before me that, being informed of the contents of said instrument, she executed the

same voluntarily on the day same bears date.

(Doc. 47-15, p. 2.)

Federal Rule of Civil Procedure 56(c)(4) states that: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4). *See Hamilton v. Coffee Health Grp.*, CV-10-S-3621-NW, 2013 WL 2635304 (N.D. Ala. June 6, 2013) (quoting Rule 56(c)(4)). In addition to stating that the affidavit is being executed by "Kenneth and Debbie McElroy," the affidavit makes no attempt to identify who Lisa Rosser is, in what capacity she testifies, or that her affidavit is based upon her personal knowledge. Accordingly, the entire affidavit lacks a showing of both competence and personal knowledge. It is therefore due to be stricken.[3] "Affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper." *See, e.g., Story v. Sunshine Foliage World, Inc.,* 120 F.Supp.2d 1027, 1030 (M.D.Fla. 2000). *Accord, Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).

The plaintiffs next argue that paragraph one of the affidavit contains hearsay.

---

[3]This document is also not "sworn" by Lisa Rosser. It states only that it is sworn by Kennth and Debbie McElroy. Further, does not state that it is signed "under penalty of perjury" so as to make it admissible as an "unsworn declaration" under 28 U.S.C. § 1746.

10

"Hearsay" means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."   Fed. R. Evid. 801(c).   In this case, the guidelines are an out of court statement, summarized by the affiant to prove the truth of the matter asserted in the guidelines, that "a city should have on hand a 'reserve fund' or 'unassigned funds' an amount equal to three times its monthly operating expenses."   Similarly, the auditor's opinions are out of court statements restated by the affiant to prove the truth of the matter asserted, that "most cities have four-to-six months in their reserve funds."

The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial.  *Wyant v. Burlington Northern Santa Fe Railroad, R.C.*, 210 F.Supp.2d 1263 (N.D. Ala. 2002) (quoting, *Pritchard v. Southern Co. Services*, 92 F. 3d 1130, 1135, *amended in part on rehearing*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997)).   No such showing having been made in this case, paragraph one is due to be stricken as inadmissible hearsay.

Paragraphs two, four, and five set out information regarding the City of Gadsden's monthly operating expenses, its unassigned funds, and the functions of

11

GASB respectively.   These paragraphs are also due to be stricken because the affiant does not explain how she has such information.   Accordingly, she has not shown that she is competent to testify to these facts.   Further, she does not state that she has personal knowledge of these facts.   "Naked conclusions are not sufficient to create a genuine factual issue."   *Mader v. City of St. Petersburg*, 725 F. Supp. 492, 494 (M.D. Fla. 1989).

Paragraph three is an opinion.   Under the Federal Rules of Evidence, a witness can testify in the form of an opinion if the witness is properly qualified as an expert and certain other requirements are met.   *See* Fed. R. Evid. 702.   In this case, Rosser is not identified as, nor has she been qualified as, an expert.   If a witness is not qualified as an expert, she can only testify in the form of an opinion if the opinion "is limited to one that is:"

(a)    rationally based on the witness[]'s perception;

(b)    helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c)    not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.   None of these exceptions have been shown to apply.   Paragraph three is due to be stricken for this reason as well.

12

## 2.    *The Deposition of Diane Scott*

The plaintiffs attack the following portion of the Scott deposition as inadmissible lay opinion testimony.

> Q.    In your opinion, would a municipality with a 27.98 percent contribution rate be prudent to adopt the 2.5 increase in employee contribution rates?
>
> MR. FITZPATRICK: Objection.  She's not been qualified as an expert here, and she's not been shown to have any basis for making an opinion about Gadsden and its finances.
>
> Q.    That's a very good objection, but I can still hear your answer.
>
> MR. FITZPATRICK: And it's entirely speculative.
>
> MR. HOWARD: Okay.
>
> A.    In general, when you look at employee benefits as a percentage of salary, which this is it, you start to think of certain things. First is your FICA ratio at 7.65 percent. Okay? Then you've got a health insurance percentage. Let's just say that's about 10 percent. I don't know what theirs is. Okay? You've got between SUI and FUI -- let's just say about a 1 percent.  Okay? And then you look at a retirement percentage. And if you've got 22 percent there -- 23 because it rounds up, you've got -- you've got 41.65 percent of salaries as your benefits – 20 percent of benefits. In general, I think that that is a little high -- is high. Okay? In the other organizations where I have worked and -- we did not have benefits at 40 percent of salaries.  It was unsustainable.

(Doc. 47-5, pp. 124-126.)

Scott has not been qualified as an expert.  No showing has been made that this opinion testimony is otherwise admissible.  It will also be stricken.

The plaintiffs also state:

> During examination by the City's lawyer, Scott wandered into a rambling discussion speculating about what might happen if a city failed to make its pension contributions, future changes in accounting rules, and what might happen if bond rates increased and ratings decreased. See, doc. 47-5, pp. 90-106.

(Doc. 56, p. 3.)  The plaintiffs do not cite to specific testimony in these 16 pages.  A review of these pages shows mixed fact and opinion testimony.  In the absence of an objection to specific sections on a specific basis, the court will not comb through these pages in an attempt to imagine every objection the plaintiffs may have. However, to the extent that the defendants use certain portions of the Scott deposition to support their motion, the court will address admissibility as to that section, to the extent the plaintiffs have objected thereto.

### 3.   *Conclusion*

Based on the foregoing, the motion to strike will be **GRANTED**.  The entire affidavit of Lisa Rosser, and the above quoted portion of the Diane Scott deposition will be **STRICKEN**.

### B.   <u>Individual Factual "Denials" Treated as Motions to Strike</u>[4]

---

[4]The court would normally merely place a footnote in its "Facts" section of the ruling on the motion for summary judgment to indicate facts which were omitted for these reasons. However, because of the vast number of such denials, the opinion on the motion for summary judgment would have become too cluttered.  Accordingly, the court will address all such denials here.

14

All facts listed in this section have been omitted from the "Facts" portion of the court's opinion on the motion for summary judgment. All facts are offered by the party indicated below, and are the subject of a "denial." However, each is denied not because the objecting party provided evidence to support a contrary view, but because the party denying the fact contends that the evidence which supports the proffered fact is inadmissible. In the interest of brevity, the court will not restate each objection in its ruling. However, each ruling will be based upon those objections unless otherwise indicated.

      **1.**     ***Defendants' Facts Not Included***

          **a.**     **"General accounting standards for municipalities hold that this percentage should never be over 60 percent." (Doc. 51, p. 4) (citing 47-1, p. 115-116 (Rosser deposition)).**

The citation for this fact is Rosser's testimony that "most accounting standards will tell you that this percentage should never be over 60," and explaining that she was referring to "gap standards." (Doc. 47-1, p. 115.) This testimony is hearsay to the extent that it attempts to summarize the standards. Further, Rosser is offering an expert opinion when she has not been qualified as an expert. For these reasons, and for the reasons stated in its opinion on the motion to strike Rosser's affidavit, this fact is excluded.

          **b.**     **"Because the population in the City of Gadsden has**

> **continued to decrease over a number of years, its tax base has continued to decrease." (Doc. 51, p. 6) (citing 47-1, p. 119).**

In the cited portion of Rosser's deposition, she testifies that her biggest concern was the number of employees the City had "[b]ecause the population in the city has decreased over the number of years; yet, we continue to increase our number of employees." (Doc. 47-1, p. 119.)  Then, in response to the question "Your tax base is going down?" she answered "Yes, it is." (Doc. 47-1, p. 119.)  Contrary to the cited "fact," her testimony does not link the lower population to the tax base going down. If it did, it would be excluded as an expert opinion offered by a non-expert. Therefore, this "fact" is disregarded as unsupported by the evidence cited.

> c.   **"Beginning with fiscal year 2015, employers (such as municipalities) must place on their financial statements the amount of unfunded liabilities they have.  In many cases such will outweigh their assets. This would have a significant, even 'devastating' impact on a city's ability to issue bonds." (Doc. 51, p. 10) (citing 47-5, p. 35 (Scott deposition)).**

This statement cites Scott's testimony to this effect.  Scott has not been qualified as an expert, and no showing has been made that this opinion testimony is otherwise admissible.  Further, the citation does not support the opinion about the impact on the City's ability to issue bonds.  Also, to the extent Scott is quoting a source, the opinion is hearsay.

16

> d.    **"Other criteria to determine actuarial soundness include whether historically the ARC has been met, and whether there is a cap on what the employer must provide.  Failing to meet the ARC on even one occasion contributes to greater liabilities placed on the books affecting credit and bondworthiness." (Doc. 51, p. 51) (citing doc. 47-5, p. 96).**

This is also based upon an expert opinion offered by Scott, who is not an expert.  It will not be included for this reason and because the fact is not supported by the citation given.

> e.    **"Aside from the GASB rule change about unfunded liability on the employer's books, other impending changes in GASB rules and in Moody's evaluations could affect existing bond issues, decreasing a rating and increasing the interest rates on such bonds." (Doc. 51, p. 12) (citing doc. 47-5, pp. 99-103).**

This "fact" is excluded as inadmissible "expert" opinion testimony by Scott.

> f.    **"A ratio of about eighty percent (80%) is considered acceptable by Scott."  (Doc. 51, p. 12) (citing (47-5, p. 112.)**

This fact is supported by an inadmissible statement of expert opinion by Scott.

> g.    **"The City is supposed to have reserve funds of three times its monthly operating expenses, according to the standards of the Governmental Accounting Standards Board." (Doc. 51, p. 17 (citing 47-15 (Rosser affidavit)).**

The only support for this fact is the Rosser affidavit, which will be stricken for the reasons set out earlier in this opinion.

      h.     **"The Governmental Accounting Standards Board (GASB) promulgates standards and guidelines by which accountants and auditors are governed. These include standards and guidelines for public entities. GASB standards are recognized in the financial industry as setting forth reporting procedures by which public entities should operate." (Doc. 51, p. 17) (citing 47-15).**

The only support for this fact is the Rosser affidavit, which will be stricken.

      i.     **"According to the 2013 budget, the City of Gadsden's monthly operating expenses were projected to be just under $3.8 million. Therefore to be within GASB guidelines the City would need to have $11.4 million in its 'unassigned funds' line item." (Doc. 51, pp. 17-18) (citing 47-15).**

The only support for this fact is the Rosser affidavit, which will be stricken.

    **2.**     ***Plaintiffs' Facts Not Included***

      a.     **"The employees' agreement was to contribute additional funds in excess of 6% for a three year period." (Doc. 49, p. 13) (citing 47-1, p. 50).**

This fact is not based upon the witness's personal knowledge. Rosser testified that this was an "assumption," and that "[o]ther than hearsay, [I] really didn't know what their agreement was." (Doc. 47-1, p. 50.)

      b.     **"Although the employees' contribution costs to retirement increased by 30%, Rosser testified it was justified because its 'a dad-gum good retirement.'" (Doc. 49, p. 16) (citing doc. 47-1, pp. 147-148).**

18

First, the cite the plaintiffs give is wrong. The quoted material appears on page 146 of document 47-1. Second, the plaintiffs misstate the testimony. Rosser was asked "what did the employee get in return for the loss of that salary? In other words, how did the employee's pension benefit increase?" (Doc. 47-1, p. 146.) After an objection to the form of the question, Rosser answered: "One day when I retire, I have a dad-gum good retirement. I didn't lose a thing." (Doc. 47-1, p. 146.) Rosser's opinion as to the soundness of the retirement plan, and how good it is, is inadmissible.

      **c.**    **"The increase in employee contributions did not improve the actuarial soundness of the pension plan." (Doc. 49, p. 17) (citing doc. 47-1, pp. 149-150).**

Ironically, this statement is based upon the same type of lay opinion statement by Rosser to which, when offered by the defendants, the plaintiffs have objected and moved to strike. The defendants move to strike the statement because "the term, 'actuarial soundness' is an oft-repeated misnomer that has little significance to the city's adoption of the increased contribution measure. A plan's 'actuarial soundness' is gauged by looking at the unfunded liability ratio; it has little or nothing to do with the contribution rates *per se*." (Doc. 58, p. 9) (citing 47-1, p. 159 (Rosser deposition); 47-5, p. 77-78, 82-89 (Scott deposition)). This appears to be an objection to relevance.

"Actuarial Soundness" is not an issue here.  The City does not argue that the rates were increased to "shore up" the plan.  They argue that they were increased to reduce its costs.  Further, these statements constitute inadmissible expert opinion testimony by a lay witness.

> **d.   "Guyton believed the City was paying 26% in retirement costs which he believed was the highest in the state."  (Doc. 49, p. 18) (citing doc. 47-2, pp. 23-24 (Guyton deposition)).**

This support for this fact is deposition testimony which is not based upon the witness's personal knowledge.  As to these numbers, Guyton states in his deposition that "I never read anything to tell me that, but supposedly the people who had checked on it said that's about right."  (Doc. 47-2, p. 24.)

> **e.   "The pre-merger actuarial study determined that additional funds were needed to resolve the unfunded liability."  (Doc. 49, p. 30) (citing doc. 47-8, p. 16-17 (Smith deposition)).**

The fact is supported by the following exchange in the deposition of Randy Smith:

Q.   Do you have any knowledge, and, if so, I'm going to ask you the source of your knowledge or the basis of your knowledge, about how somebody came up with paying 35 months an additional 5 percent into that supplemental fund?

A.   Definitely.

Q.   How did that come about?

20

A.    Well, we had an actuary done from the State to see what it was going to cost the City in additional funding to convert money. We had like $8 million in our retirement fund. And, after you donated that or put that into the fund, then, to pay off the unfunded liability, the State came back with the number, I think at that time it was going to be 17 percent of the entire City's severance in order to pay off the unfunded liability, which was probably going to take 17 years. We are starting year 10 of that now.

The total increase then, when you combine that with what the City was paying -- and I forget the exact percentage is paid on the other city employees, I think it was three or four percent, with the 26 percent of police and firemen salaries. The additional cost was going to be 1.3 million. That's where the Committee came in.

(Doc. 47-8, p. 16-17.) This summary is inadmissible hearsay.

> **f.    "When the merger was discussed in 2000 and 2001, it was anticipated that the unfunded liability would be amortized over a 17 year period."  (Doc. 49, p. 30) (citing doc. 47-8 p, 39).**

First, the "fact" is not found in the cited testimony.  Smith testified that "it was amortized over 20 years."  (Doc. 47-8, p. 39.)  He also stated that "they projected, if the returns remain the same as they have in the past, it would probably be paid down in 17 years."  (Doc. 47-8, p. 39.)  Second, even though Smith was on the committee, there is no foundation for how he knew about how long the liability would be amortized.

> **g.    "It was well known that the City would be paying a large amount for a long time."  (Doc. 49, p. 30) (citing 47-8, p. 40).**

21

This statement is supported by Smith's testimony that "everybody knew that the City of Gadsden would have to pay a lot of money over a long time." (Doc. 47-8, p. 40.)  Smith's opinion that "everybody knew" is excluded as speculation.

> **h.**     **"During the pre-merger negotiations, it was anticipated that the City's contributions would increase and peak over a 12 year period.  The state ERS representative confirmed that such a trend would continue." (Doc. 49, p. 160) (citing 50-12, pp. 18-20 (Matlock deposition)).**

A review of the evidence cited reflects that Matlock "assumed" that this would be the case, based upon his "understanding" of what he was told by a state representative from the ERS.  This statement is a conclusion based upon hearsay.

> **i.**     **"Calvert initially made an extra contribution to ERS to 'buy into' the program."  Doc. 49, p. 32) (citing 50-13, p. 9 (Calvert deposition)).**

When asked in his deposition whether he ever paid 11 percent, Calvert testified that "[t]here again, to my knowledge, I'm not up on all the numbers." (Doc. 50-13, p. 8.)  He said "I thought we paid an extra amount to get into the program.  And then it was scaled back for us." (Doc. 50-13, p. 8.)  He stated that it was his understanding that the extra amount was "to buy into the program," and "[o]nce we bought in, it was supposed to go to six percent.  That's my understanding.  I don't know how accurate that is." (Doc. 50-13, p. 9.)  These statements reflect that Calvert did not know whether he was paying more, and, even if he did, was not sure where the extra money

went.  The "fact" will not be considered.

> **j.   "Harrelson has learned that the 5% extra he contributed to the Supplemental Fund was not used to resolve unfunded pension liabilities, but simply kept by the City."   (Doc. 49, p. 34) (citing 50-14, p. 34 (Harrelson deposition)).**

Harrelson testified only as to his "understanding." (Doc. 50-14, p. 34.) He said he "found out" that the City just kept that money, without explaining how he got this information. (Doc. 50-14, p. 34.)  He said he was "pretty sure" that the City did not pay down the unfunded liability but just put the money into its general fund.  (Doc. 50-14, p. 35.)  He admitted later that he didn't know if the City put the money into the general fund and then later sent in the money towards the unfunded liability.  (Doc. 50-14, p. 36.)  When asked again how he knew the City did not use it for paying off the unfunded liability he said: "I know the City.  They didn't."  (Doc. 50-14, p. 36.) The witness's opinion, which is clearly not based upon his personal knowledge, cannot support this "fact."

> **k.   "Mayben has learned at union meetings that the additional 5% was not used by the City to reduce unfunded liabilities."  (Doc. 49, p. 35) (citing 47-13, pp. 13, 20 (Mayben deposition)).**

Mayben testified that "to the best of [his] knowledge" the extra money did not go to pay the unfunded liability.  (Doc. 47-13, p. 12.)  He said his knowledge was based on "rumors" and from "what was discussed at the Union meetings." (Doc. 47-

13, p. 13.)  Mayben's testimony is excluded as hearsay.

> **l.    "There were several factors why the actuaries said the former PFRF was going broke.  Those included the sliding scale increases provided to retired employees." (Doc. 49, p. 35) (citing 47-13, p. 19).**

The defendants object to this statement as "an answer to an improper leading question," "testifying without personal knowledge and otherwise without sufficient foundation or other indicia of reliability, and this otherwise constitutes inadmissible opining."  (Doc. 58, p. 21.)  The cited portion of Mayben's deposition reads:

Q.    And the reason that the actuary said that the fund was going broke was because the benefits for --

MR. HOWARD: Object.

BY MR. FITZPATRICK:

Q.    -- for retired employees were, in the opinion of some, rather generous?

A.    Yes, sir. Sliding scale.  There were several different things that were contributing factors, I believe.

(Doc. 47-13, p. 19.)  Mayben is not testifying based upon his person knowledge.  He is recounting what he remembers the actuary report saying.  This is excluded as hearsay.

> **m.    "It was agreed that the police and firefighters would pay an extra 5% for three years, and the responsibility to resolve the balance of the unfunded liability was the City's."  (Doc. 49, p. 35) (citing doc. 47-13, p. 21).**

24

The defendants properly object that testimony supporting the statement was based only on the witness's "understanding." (Doc. 47-13, p. 21.) No foundation for it was cited.

**n.     "By increasing Mayben's pension contribution, the City of Gadsden reduced its costs."  (Doc. 49, p. 35) (citing doc. 47-13, p. 27).**

The defendants properly object that testimony supporting the statement was based only on the witness's "understanding." (Doc. 47-13, p. 21.) No foundation for it was cited.

**o.     "The additional payment for three years was to 'pay us in full' for costs related to the prior PFRF."  (Doc. 49, p. 37) (citing doc. 47-14, p. 23 (Morris deposition)).**

Morris's cited testimony is actually: "they said after we paid, that would be the end of it." (Doc. 47-14, p. 23.)  To whom "they" refers is not stated.  When asked to explain what his statement meant, he stated: "We were supposed to pay three years total at five percent, that would pay us in full.  That would allow us to go on State Retirement." (Doc. 47-14, p. 23.)  This testimony is a speculative conclusion based upon inadmissible hearsay.

**p.     "Additional special pension costs of the merger were to be absorbed by the City."  (Doc. 49, p. 37) (citing 47-14, p. 27).**

The support for this fact is the following portion of Morris's deposition:

Q.     Was it understood between the employees and the City that further special costs of the merger would be absorbed by the City?

MR. HOWARD:  Object to the form.

THE WITNESS:

A.     Yes.

(Doc. 47-14, p. 27.)  No foundation for this "understanding" has been cited.  Further, the statement is speculation as to what others "understood."

> **q.     "The step increase may be repealed in the future." (Doc. 49, p. 38) (citing 47-14, p. 32).**

The support for this fact is the following portion of Morris's deposition:

Q.     Did the City lower the amount of pay that people get under the pay scale?

MR. HOWARD:  Object to the form.

THE WITNESS:  Yes.

BY MR. FITZPATRICK:

Q.     So that one and a quarter percent increase, could the City take that away if it wanted to?

MR. HOWARD:  Object to the form.

THE WITNESS:  Yes.

(Doc. 47-14, p. 32.)  The defendants object to this fact only "to the extent that the witness is asked to testify as to whether a step increase may be repealed in the future."

(Doc. 58, p. 23.)  As to this point, the testimony is speculative and excluded.

        r.    **"The City should have reduced personnel costs by cutting salaries or reducing the number of employees." (Doc. 49, p. 40) (citing 47-10, p. 29 (Putman deposition)).**

Putman did testify to this, but he was not shown to be an expert, or to be in the position to make such a statement.  His statement lacks foundation and therefore is excluded.

        s.    **"The City was motivated because it wanted the employees to agree to move from a City funded Blue Cross plan to the State Health Insurance Plan to reduce the City's health insurance costs."  (Doc. 49, p. 41) (citing 47-11, pp. 13-14 (Taylor deposition)).**

This fact is based upon the following testimony from Taylor: "The City was interested, because I think at the time, according to the Mayor and the Finance Director, Tony Stapler, the pension fund was creating a problem with them as far as bond market was concerned. It was shown as a detriment to them.  So they were as motivated as us to try to get this done." (Doc. 47-11, p. 13.)  The defendants properly object that this testimony "is without sufficient foundation, is based upon inadmissible hearsay, and is speculation."  (Doc. 58, p. 25.)

        t.    **"The problems with the PFRF were significant and the employees believed that by paying the extra cost for a few years they would have a sound pension." (Doc. 49, p. 41) (citing 47-11, pp. 24-26).**

This statement is the plaintiffs' summary conclusion taken from three pages of testimony. It is not a "fact." Further, to the extent that it attempts to summarize anything to which Taylor testified, he cannot speak for what other persons "believed." This "fact" is excluded.

> **u.** **"At the time the City adopted the local option in 2011, it repeatedly told the Gadsden Times that the City was in good financial condition." (Doc. 49, p. 41) (citing 47-11, pp. 34-35).**

The fact cites for its support the testimony of Taylor, as to what the City told the newspaper. It is inadmissible hearsay and therefore excluded.

> **v.** **"At the time of the merger of the systems, it was anticipated that the cost of amortizing the unfunded liability of the PFRS would be spread over 20 years." (Doc. 49, p. 42) (citing 47-11, p. 46).**

The portion of Taylor's deposition cited is inadmissible hearsay. Referring to the Alabama ERS representative, he testified:

> When the lady came both times, she explained, even to us at our level, that the funding was amortized over 20 years, that over the 20 years it was set almost like a bell curve of a test where the contributions could rise, could rise, could rise, and then they would begin to fall off on the City's behalf.

(Doc. 47-11, p. 46.)

> **w.** **"It was also agreed in 2002 that the extra costs of the unfunded liability would be borne by the City." (Doc.**

**49, p. 42) (citing 47-11, p. 512).**

The defendants properly object that this fact is based upon Taylor's "understanding."  No foundation for his testimony has been cited.

> **x.   "Sherrill paid an additional 5% pension contribution for three years which was put in the City's general fund rather than applied to his pension." (Doc. 49, p. 43) (citing 50-20, p. 9 (Sherill deposition)).**

The fact cites a portion of the Sherill deposition where he states that he "thought [it] was going to be paid on the pension, and it wasn't." (Doc. 50-20, p. 9.) When asked why he would say that, he stated: "It was put into the general fund." (Doc. 50-20, p. 9.)  However, Sherill admits in his deposition that he does not know where the money went after it went into the general fund.  (Doc. 50-20, p. 9.)

> **y.   "The rights to participate in the pension system and receive future benefits are considered part of the employee's overall compensation." (Doc. 49, p. 45) (citing doc. 47-5, p. 25).**

The defendants correctly argue that this fact statement, based upon the nearly identical language in Scott's deposition, is speculative, an inadmissible opinion, and a conclusion.  Scott cannot testify as to how someone else views the pension system.

> **z.   "The RSA's involvement in the legislative process largely focused on calculating the savings to the state of various proposals evaluated by the Legislature and other State agencies." (Doc. 49, p. 49) (citing doc. 52 (documentary evidence)).**

29

The support for this assertion is a <u>general</u> citation to <u>219 pages of exhibits</u>. Such general references do not suffice to support facts, as the court's scheduling order requires that "[a]ll statements of fact must be supported by <u>specific</u> reference to evidentiary submissions." Further, the statement is not a "fact," it is a conclusion.

> **aa.   "The records produced show no legislative purpose other than to reduce the state's pension costs for its employees." (Doc. 49, p. 49) (citing doc. 52).**

The support for this assertion is a <u>general</u> citation to <u>219 pages of exhibits</u>. Such general references do not suffice to support facts, as the court's scheduling order required that "[a]ll statements of fact must be supported by <u>specific</u> reference to evidentiary submissions." Further, the statement is not a "fact," it is a conclusion

## C.   <u>The Motions for Summary Judgment</u>

### 1.   *Facts*[5]

#### a.   **The PFRF and the ERS**

The Policemen's and Firemen's Retirement Fund of the City of Gadsden ("PFRF"), was a pension plan that was originally created in 1939 by the Alabama

---

[5]Typically, when ruling on a motion for summary judgment, the court will cast the facts in the light most favorable to the non-movant. In this case, the parties are, at the same time, both movants and non-movants. For that reason, in this section the court will set out only facts upon which there is no dispute, or upon which the evidence clearly supports only the proffered fact <u>as stated by the court</u>. In the latter case, the court will provide a citation to the record. Citations will also appear when material is quoted. Where the parties agree on a fact, no citation will appear.

Legislature.  Both the City and the participant's costs of contributing to the PFRF were high. Under the PFRF, police and firefighters were paying eleven 11% of their base salary into the system, and the City was paying 26%.   The system no longer exists.

At the same time that some Gadsden employees participated in the PFRF, other Gadsden city employees participated in the Employees' Retirement System of Alabama ("ERS"), a part of the Retirement Systems of Alabama ("RSA").[6]  The ERS system was established in 1945, and provides both disability and service retirement benefits to members and survivors.  In addition to the State of Alabama, localities, like the City of Gadsden, can choose to come under the plan.  In fact, the majority of ERS participants are employed by some local jurisdiction rather than by the State of Alabama.  The system is mandatory in that, if an employer is part of the ERS, all full time employees of that employer must participate.

The ERS is a "defined benefit plan," meaning that monies are collected and invested with the intent of providing certain defined benefits under the terms of the retirement plan statutes.  Increased employee contributions are recorded on each employee's annuity benefit account.  If an employee were to withdraw from the

_____

[6]The RSA also includes the Teachers' Retirement System, Public Education Employees' Health Insurance Plan, RSA-1 Deferred Compensation Plan, and the Judicial Retirement Fund. See http://www.rsa-al.gov.

system early, those contributions can be withdrawn.

ERS participants with over ten years of creditable service have vested rights in the system.  An employee with 10 years of creditable service has vested rights to a pension at age 60.  An employee with 25 years of creditable service has vested pension benefits regardless of age.

In contrast to the PFRF, under the ERS employees are required to contribute a percentage of <u>all compensation</u>, rather than just base pay.  In Gadsden in 2002, police and fire employees  (collectively "hazardous duty employees"), who did not participate in the PFRF, contributed 6% of their salary to the ERS.

### b.     The Named Plaintiffs

Joe Taylor has been employed by the City of Gadsden for 18 years.  Taylor was a participant in the PFRF, and, in the late 1990s, was instrumental in identifying the problems with the PFRF and opening communications with the RSA.  He has 20 years of creditable time in the pension system, and was vested in 2011 when the City raised contribution rates.  Taylor pays additional contributions for his already vested pension but receives no additional benefits.

Jeffrey Mayben, except for a brief layoff period in 1986, has been employed by the Gadsden Fire Department since December 1985.  Mayben was a participant in the PFRF for 17 years.  Mayben has about 30 years of creditable service in the

pension system.  He had already vested in his pension when the City increased his contribution rate.  Mayben was eligible to retire and begin receiving his pension before the contribution rate was increased.

Lecil Harrelson is an employee of the Gadsden Fire Department.  He was hired in 1985 and has been employed by the Gadsden Fire Department for 27 years. Harrelson was a participant in the PFRF until it was merged with the ERS in 2002. After the PFRF was merged into the ERS, Harrelson paid the 5% supplemental contribution for 3 years.  Before the City's election to increase pension contributions in 2011, Harrelson was fully vested in his pension.  He testified that the City's decision did not change his benefits at all.[7]  Harrelson believes the City Council "stole my money" by increasing pension contributions.

Jeff Morris has been employed by the Gadsden Fire Department for 21 years. Morris was a vested participant in the PFRF System from 1991 until it merged with the ERS.  Morris supported the merger with the ERS.  At the time of the merger, Morris became vested in the ERS.  Morris has contributed an additional 2.25% of his salary to his pension for the first year, and an additional 2.5% since October 1, 2012.

---

[7]This fact, also proffered by the plaintiffs, originally included that he was also provided no "actuarial improvement in his pension." (Doc. 49, p. 33) (citing 50-14, pp. 31-32).  The defendants properly object to this statement as the witness did not so testify.  He only agreed that the "soundness of [his] investment in the pension system" did not change. (Doc. 50-14, p. 31.) Further, the defendants correctly point out that there is no foundation or showing of personal knowledge for this testimony.

The additional pension contributions have resulted in a reduction of Morris's take-home pay.  Every other member of the Fire Department has been similarly treated.

John A. Calvert was hired by the City of Gadsden as a firefighter in October 2004.  As soon as he was employed, Calvert began participating in the ERS.  He contributed six percent of his salary to the ERS.  He was never a member of the old fund.  (Doc. 50-13, p. 8.)

William David Putman has been employed by the Gadsden Fire Department since October 2004.  Putman paid the 6% to the ERS and 5% to the City supplemental fund for about 11 months when he was first employed.  Putman was told[8] when he was hired that the supplemental contribution would end after the 3 year term and he would contribute 6% to the ERS based on state law.  He was also President of the Firefighters Union when the contribution change occurred.

Derrick Sherrill is a named plaintiff and has been employed by the Gadsden Fire Department for 19 years since 1993.  Sherrill has over 20 years of creditable pension service and is fully vested in his pension.  Sherrill was fully vested in his pension when the City increased the pension contribution rate by 2.25%.  When rates were increased, there was no change in his benefits.

---

[8]The parties agree that he "was told," but do not specify by whom.

### c.  Pre-Merger Discussions

In the late 1990s, actuarial reports showed that the PFRF lacked the resources to meet its long-term obligations.  The PFRF was paying out benefits as fast as the current employees made contributions, and the parties agree that the system was "going broke."[9]

Steve Means served as Mayor of Gadsden from the mid-1970s until 2006. Means knew of the problems of the PFRF and believed that the ERS was "solid as a rock." (Doc. 47-2, p. 9.)  Means sought to develop, with representatives of the police and fire department, an acceptable plan to resolve their pension issue.  He wrote a letter to the firefighters union on March 31, 2000, urging an agreement to merge the PFRF pension system into the ERS.  He then participated in negotiations with the employees on the details of merging the systems.  It is undisputed that any such merger required approvals from the Mayor, the City Council, the employees, and the ERS.

One of the problems with a merger was that Gadsden would have to accept what the parties call the PFRF's "unfunded liability." The parties recognize that the

---

[9]The board of the PFRF consisted of the Fire Chief, a fire union representative, a police union representative, the Police Chief, a retired firefighter and a retired police officer.  Fire Chief Carroll testified that when he joined the board in 1999 "there were issues with the – if whether or not the – the fund was actuarially sound."  (Doc. 50-9, p. 12.)  He said, "from '99 till . . . 2002, I was on the board and there was always a – an issue about more money was going out than was going to be able to come in as far as making it actuarially sound."  (Doc. 50-9, pp. 12-13.)

PFRF had a liability of about $40 million.[10]  (Doc. 47-5, p. 110.)  Accordingly, the parties to the merger needed to address whether employees coming from the PFRF should contribute more than those already in the ERS in an attempt to offset some of the liability.

Means requested that Fire Department employees appoint a committee to discuss pension transition issues.  The firefighters elected Assistant Fire Chief Randy Smith, Assistant Fire Chief Jimmy Matlock, and an employee named Mickey Lee. Smith served on the PFRF board in the late 1990s, and he testified that he understood at the time of the merger that the conversion was going to require an input of additional money.  (Doc. 47-8, pp. 12-13.)[11]  Matlock began working for the Gadsden Fire Department in October 1980.  Matlock participated in the PFRF until it merged with the ERS in 2002.  The committee's work included meetings with the Mayor and City financial personnel.

Jerry L. Gladden, the personnel director for the City of Gadsden, Finance

---

[10]The plaintiffs object to this fact, arguing that the City had this liability before the merger.  (Doc. 57, p. 11.)  They provide no citation with their objection as required by this court's scheduling order.  The objection is therefore OVERRULED.  Regardless, whether the City had this obligation before the merger or not, it is undisputed that it was an issue, and a point of negotiation, between the mayor and the employees.

[11]The plaintiffs proffer that this was generally understood and cites to Smith's testimony that "[w]e knew that that's the way it had been presented to us." (Doc. 49, p. 29) (citing 47-8, p. 13).  The defendants object to this testimony stating that it "is testimony lacking proper foundation, based on hearsay, lack[ing] . . . personal knowledge, and is otherwise inadmissible." (Doc. 58, p. 16.)  The objection is SUSTAINED.  The "fact" will not be considered.

Department employee Susan Abraham, Carroll, Matlock, and City Attorney Roger Kirby, met with ERS officials to discuss the merger.  The record does not reflect exactly what occurred at these meetings.[12]  It is undisputed, however, that employee contribution rates were discussed in the course of evaluating the merger.

The employees evaluated the issue over a period of time and, eventually, an agreement was reached and approved by all parties.  The solution was that the PFRF would be merged with the ERS, and the firefighters, after they became part of the ERS, would continue to contribute 11% of their compensation for three years, just as they had under the PFRF.  Six percent of their contribution would go towards the ERS, the same as other hazardous duty employees already part of the ERS.  The additional 5% contribution would go to a "supplemental fund" to offset the unfunded liability of the PFRF.  After 3 years, the additional 5% contribution would end, and the firefighters would pay the same as other hazardous duty employees.

Former Mayor Means testified as follows regarding why the additional contribution was needed:

> Q.   Okay. We have spoken and the term has been used in depositions quite a bit about an agreement between the City and the firefighters. And I want to make sure I'm exploring this correctly.
>
> Why was it necessary for the firefighters and police officers

---

[12]That is, there is no <u>admissible</u> evidence to that effect.

to pay additional monies into a supplemental fund as part of getting them in the State retirement system?

A.      Best I remember, is was tremendous expense to the City, the portion we were going to put in. And at the time we were just looking for any additional funding source we could get to ease the burden somewhat.

Q.      Right. And was there a point that the City would have considered it to be cost prohibitive if they had not had those additional contributions from the police officers and the firefighters?

A.      I suspect that the council wouldn't have passed it to begin with without that supplemental contribution. So I don't know.

Q.      All right. And without the council passing and approving any deal like this, then the status quo simply would have remained the status quo, right?

A.      Correct.

(Doc. 47-3, pp. 39-40.)   Means has no recollection of any agreement with the firefighters whereby they would be excepted from any increase in contribution rates in the future.

It seems that whether the rate could ever be increased was not discussed at all. Smith testified that there was never a discussion about a rate increase. (Doc. 47-8, p. 24.) Matlock testified that he does not remember whether an increase in the future contribution rate was actually ever discussed by either City officials or ERS officials. Harrelson was also involved in several merger meetings with Mayor Means.  He states that there was never any representation, at the meetings he attended, that the

38

ERS employee contribution rate would, or would not, increase. Taylor says that during the discussions in which he participated, there was no discussion, nor contemplation by anyone, that the ERS employee contribution rate would change.[13] Morris remembers discussions about merging the old fund into the ERS, but does not remember any discussion of whether the base contribution rate would change.

### d.     The Merger

Ala. Act number 2001-498 (approved by the Governor on May 17, 2001) authorized the City of Gadsden and the Board of Trustees of the PFRF of the City of Gadsden to "elect by resolution to have the employees of the police and fire departments of Gadsden participate as a local unit in the Employee's Retirement System and to transfer to that system all assets and liabilities of the fund and any other funding required by the Employees' Retirement System for such participation pursuant to Section 36-27-6, Code of Alabama 1975."  Act 2001-498, section 1.

On October 8, 2002, the Gadsden City Council adopted Resolution No. R-360-02, which authorized members of its PFRF to become members of the ERS. (Doc. 50-3, p. 17.)  Said resolution recited that "a majority of the members of the Policemen's and Firemen's Retirement Fund have indicated a desire to participate in

---

[13]Taylor personally believed the employee contribution rate would remain at 6% for the rest of his career.

the [ERS]." (Doc. 50-3, p. 18.)  The resolution further stated:

> 3.    The City of Gadsden agrees to make all prior service contributions at the rate as determined by the Actuary of the Employees' Retirement System with State prior service rate to be applicable until such determination of prior rate is made.
>
> 4.    The City of Gadsden agrees to make contributions at the normal rate for current service, which is the same as the State normal rate.
>
> 5.    The City of Gadsden agrees to pay for the initial cost of a preliminary evaluation by the Actuary to determine the accrued liability on account of prior service and to pay any other cost for Special Services of the Actuary plus the regular administrative costs of operation of the System.

(Doc. 50-3, pp. 18-19.)

Also on October 8, 2002, the Gadsden City Council adopted Resolution No. R-364-02 to amend the Management Handbook governing personnel rules and benefits to provide for participation by fire fighters in the ERS with employee contributions of 6% of compensation.  (Doc. 50-3, p. 24.)  That same date, the Gadsden City Council passed Resolution No. R-359-02 authorizing the Mayor to execute all agreements necessary for then-current and retired "members of the Policemen's and Firemen's Retirement Fund of the City of Gadsden to become participants in the [ERS]."[14]

───────────────

[14]The parties agree to this fact as quoted.  The fact was proffered by the plaintiffs without a citation to the record.

On October 17, 2002, Gadsden Ordinance No. 0-58-02 was approved.  (Doc.

50-3, p. 10.)  The ordinance created a "Supplemental Fund" to be "used exclusively

for the costs of participation in the ERS for employees who immediately prior to

November 1, 2002, were members of the Policemen's and Firemen's Retirement Fund

of the City of Gadsden." (Doc. 50-3, pp. 10-11.)  The ordinance further provided that

employee contributions to the fund (including "all employees beginning work on or

after November 1, 2002") would be

> an amount equal to five percent (5%) of their compensation, on the same
> basis as employee and employer contributions to the [ERS] are
> calculated.  This withholding shall apply for work from November 1,
> 2002, through September 30, 2005.

(Doc. 50-3, p. 11.)

Also, on October 17, 2002, the City adopted Ordinance No. 0-59-02, amending

the City ordinance providing for retirement of fire fighters and police officers to

provide that the City administrators "shall withhold the sum of six percent (6%) from

the compensation paid to all police officers and fire fighter city employees who are

eligible participants in the [ERS] and remit the withheld funds to the [ERS]." (Doc.

50-3, p. 15.)  The ordinance further provided that the "finance director shall pay an

additional amount to the [ERS] as required by its regulations as the employer

contribution cost on behalf of each participant."  (Doc. 50-3, p. 15.)

In 2002, the merger was completed and $9,293,200 (the assets of the PFRF)

41

was transferred from that fund to the City's ERS account.[15]  While this reduced the unfunded liability of the PFRF, at least[16] $30 million remained.  Firefighters continued to make 11% payments until 2005.  In that year, as scheduled, the City stopped administering the supplemental fund.  The record is unclear as to how much of the unfunded liability remained at that time.

### e.      The City's Portion of the Pension Fund Costs

The parties agree that the City's contribution rate to its ERS account is based on what the ERS actuaries determine is necessary to keep the fund in good financial condition.  Before the merger, the City's portion of the ERS (its "account") had no unfunded liability.  Gadsden's ERS fund was 100% funded.  Afterward, it was 56.2% funded, and most recently is 54% funded.[17]  The City's contribution rate, as required by the ERS, was 1.81% in 2001, 1.24% in 2002, and 1.85% in 2003.  After the merger, the City's ERS contribution rate substantially increased to 21.49% because

---

[15]The parties agree that this is the figure.  However, in the course of the nearly 400 proffered facts in this case, they also agree at one point that the figure is closer to $8 million. Regardless, the assets did not satisfy the complete liability of the PFRF, and left a substantial unfunded liability.

[16]The parties also "agree" to two different figures here.

[17]A document attached as part of Exhibit 11 to Rosser's deposition is entitled: "Employees' Retirement System of Alabama, Actuarial Valuation As of September 30, 2010." (Doc. 50-3, p. 92.)  This document shows that the "Funded Ratio" of the Employees' Retirement System of Alabama was at least 56 percent and occasionally slightly more.  (Doc. 50-3, p. 91.) The parties cannot agree as to whether the "funded ratio" means the same thing as "percent funded."

the ERS had to address the liabilities of the PFRF.  Gadsden's employer contribution rate for the years 2007-2011 hovered at 24.54% (for 2009 it was slightly higher, 25.08%).

As the current Finance Director for the City of Gadsden, Lisa Rosser has been the chief administrative financial officer of the City, subject to the Mayor and Council, since 2003.[18]  She testified that, at the time of her deposition, "as far as [she knew]," Gadsden had the second highest "retirement rate"[19] in the state of Alabama. (Doc. 50-2, pp. 5-6.)  She also said  "[w]e're going to continue to have the second highest retirement rate in the state of Alabama."  (Doc. 50-2, pp. 5-6.)

While the City has not conducted any studies or analyses to determine the extent or the cause of its increasing pension costs during the years following the merger into the ERS, there were a number of discretionary cost-of-living increases in benefits for retirees that the City authorized.  Former Mayor Means testified that the rate went from around 21% to over 24% of payroll because of these adjustments.[20]

---

[18]Rosser had no involvement in the merger of the PFRF into the ERS.  Rosser has no personal knowledge of the contribution rates, benefits or other issues regarding the PFRF. Rosser first reviewed the 2002 ordinances and resolutions effectuating the merger in 2011, after the firefighters objected to the increase in contribution rates.

[19]Notably, she did not say highest "retirement contribution" rate.  Highest "retirement rate" would mean something altogether different.  However, the parties seem to agree that she meant "retirement contribution rate."  That is how the court will view her testimony.

[20]The defendants object to this statement because "[Means] was testifying as to the contents of the documents received from Retirement Systems of Alabama."  (Doc. 58, p. 12.)

(Doc. 47-3, pp. 31-32.)  Rosser stated that "the only things that have impacted the contribution to the RSA in the last 10 years have been either COLA increases to retirees, adding police and fire to the Pension Fund, or the [Deferred Retirement Option Plan ('DROP')]."  (Doc, 47-1, pp. 74; see also doc. 47-1, pp. 85-86.)  Rosser also testified that the City's rate went to over 25% as a result of the City approving an additional lump-sum payment to retirees.  (Doc. 47-1, p. 85.)  She stated:

> And that 25 percent was driven by a host of factors, not just police and fire being put on the retirement system. I'll agree to that. There's no doubt about it. Sure, retirees had been given how many raises, and was I in favor of any of those raises? Go back and ask the council how many of those raises I supported.

(Doc. 47-1, pp. 103-104.)

Investment income is one of three revenue streams to fund the ERS, the other two being employer contributions and employee contributions. Scott testified that "as of the end of 2011, we had the worst performance of the stock market in a rolling 10 years in 175 years.  So investment income is down.  It's down for every pension fund across the United States, period."   (Doc. 47-5, p. 34.)

### f.    Gadsden's Finances in 2010 and 2011

In 2010, when the City refinanced $29 million of general obligation debt, a review of the City's bond rating by Moody's resulted in a downgrade from the City's

---

However, he also testified that that this was consistent with his recollection.  (Doc. 47-3, p. 32.)

prior AAA bond ratings.  Rosser agreed that, even though the rating has been downgraded from AAA, it was still at a very high level.  (Doc. 47-1, p. 111.) She testified as to the downgrade that she "was pleased . . . it was better than what I thought we would get." (Doc. 50-2, p. 29.)

On March 7, 2011, Rosser reported to the Mayor and Council that revenues in FY 2011 were trending up from 2010, employment in the City was consistent, and the City's expenses were under budget for the year by 4.4%.  She also stated that overall revenues were still down $130,655.00 from 2009, and stated that "Even though revenues are up from last year, as long as revenues continue to be under budget then it is important that we continue to monitor and control expenses[.]" (Doc. 55-1, p. 1.)

On April 11, 2011, Rosser told the Mayor and Council that all four major sources of revenue to the City were up in FY 2011. (Doc. 55-1, p. 2.)  She also stated that expenses had increased by 1.8%.  (Doc. 55-1, p. 2.)  On April 11, 2011, Rosser told the Mayor and Council that "the city of Gadsden is very fortunate to be in the financial condition that we are considering the economic conditions over the past two years." (Doc. 55-1, p. 2.)

In her May 2011, memorandum to the Mayor and Council, Rosser reported revenues were still increasing and expenses were under budget. (Doc. 55-1, p. 3.) That same memorandum also stated that the 1.3% increase in revenues was "a very

small increase especially when you have a $45.5 million dollar budget." (Doc. 55-1, p. 3.)

In her June 2011, memorandum to the Mayor and Council, Rosser states that "though many believe that we are out of the recession, there are still no signs of a significantly improved economy." (Doc. 55-1, p. 3.) Further, she pointed out that the three "Enterprise Funds" were "all operating at a loss for this Fiscal year." (Doc. 55-1, p. 3.) These included the Airport fund with a loss of $42,200, the Twin Bridges Golf Course with a loss of $154,623, and the Residential Garbage Fund with a loss of $348,813. (Doc. 55-1, p. 3.) She also states, "we are very blessed to be in the financial condition that we are in at the City [but] . . . [w]e only have reserves to cover less than three months of operating expenditures." (Doc. 55-1, p. 3.)

In her July, 2011 memorandum, Rosser noted that "[t]hese past years have been challenging as revenues decreased and expenses increased, but this administration rose above the challenge causing us to be in a better financial condition compared to other municipalities." (Doc. 55-1, p. 4.)

For fiscal year 2012, the City budgeted a little over $2 million deficit, balancing that by using "unassigned funds" to balance the budget. Lisa Rosser testified in her deposition that the "2011 budget, and 2012 budget . . . we had to balance both of those budgets using unassigned funds, which are rainy-day funds."

(Doc. 50-2, p. 139.)[21]   As of September 30, 2012, the City's "unassigned funds" balance was about $7.8 million.  It had dropped from $10.9 million as of September 30, 2010; and from $9.9 million as of September 30, 2011.[22]

### g.    The "Local Option"

On June 15, 2011, the Alabama Legislature approved changes to the ERS employee contribution rates.  With respect to fire fighters that are state employees, Act number 2011-676 amends §36-27-59 to increase the required employee contribution for fire fighters from 6% to 8.25% on October 1, 2011, and to 8.5% on and after October 1, 2012.  The enacted legislation, however, carves out from this increase any fire fighter participating in the ERS pursuant to §36-27-6, the provision used by the City of Gadsden in the instant case, that allows a political subdivision to elect to have its employees participate in the ERS through a legally adopted resolution.  With respect to these employees, Act 2011-676 provides that "[a]ny employer participating under Section 36-27-6, by adoption of a resolution, may elect for the increases in employee contributions provided by this act adding this language

---

[21] The defendants' proffered fact also included the phrase "which is unacceptable under general accounting principles promulgated for municipalities."  (Doc. 51, p. 3.)  The citation to the record does not support this statement.  Further, it is inadmissible as an expert opinion offered by a lay witness.

[22] Although the Rosser affidavit is also cited in support of this fact, it is included because the plaintiffs do not dispute it.

47

—

to be withheld from the earnable compensation of employees of the employer." This is referred to as the "local option."

RSA CFO Diane Scott's[23] sole role with respect to the process of adopting the law, was "limited in reviewing some of the numbers."   (Doc. 47-5, p. 28.)   She testified that the need for the increases in Act 676 was that the state's budget did not have enough monies to fund what was actuarially calculated as necessary to fund the annual required contribution (ARC) from the state.  (Doc. 47-5, p. 42.)  Scott stated that she knew that there was a shortfall because she had seen "the projections that would have been out on the website for the state's budget office . . . [which] would have been what the LFO, legislative fiscal office, would have presented to the legislature." (Doc. 47-5, p. 44.)  She stated that the State partially closed the budget gap by increasing the state employee contribution rate.[24]  Scott was not aware of any other reasons for the proposal and adoption of the Act.  (Doc. 47-5, p. 45.)

Scott was not aware of any alternative to the local option provision that was considered in the course of adopting Act 676.  She stated that the 2.5% increase in

---

[23]Plaintiffs served a 30(b)(6) notice of deposition on the Retirement Systems of Alabama seeking, *inter alia*, the RSA's testimony concerning the basis for Act 2011-676 and its application to the City of Gadsden.  The RSA, through its counsel, designated its CFO, Ms. Diane Scott, to address Act 676 and the need for the local option.

[24]She agreed that there were  many other things the State could have done to address its budget issues.

contributions by state employees did not strengthen RSA's revenue stream.  She also did not know if RSA had a position on the initial bill (HR 414) after it was introduced.  Ms. Scott did not know whether RSA supported the 2011 decision to increase pension contributions of state employees.  It is undisputed that RSA did not oppose the legislation or the provision of a local option.

Bill Paul is Deputy Director of the ERS and has been employed by the ERS for over 33 years.  Paul understands that the localities had the right to elect to come under Act 2011-676 as a "cost savings to the unit."  (Doc. 47-6, p. 10.)  He stated that, by making the election, a locality shifts more costs to the employees.  Paul confirmed that the ERS provided no guidance to localities about whether it should exercise the local option.  Paul would typically tell localities that it made no difference to the ERS whether they exercised the local option.  He does not know what Gadsden considered in the course of adopting the local option. Paul was not aware of any alternatives to the local option provision of the legislation that was considered.   He stated that of the 886 localities in the ERS, 60 (including Gadsden) have exercised the local option.

Act 676, introduced on March 31, 2011, as House Bill 414, originally only provided for an increase in the pension contributions of State employees and teachers.  The local option, or other increases in contributions by employees of localities was not in the bill.  On April 21, 2011, the Association of County Commissions prepared

an initial draft amendment to HR 414 to provide a local option.  As the legislature

neared passage, the focus remained on reducing the State's contribution costs and the

savings to the State budget.

### h.    Gadsden Exercising the Local Option

Sherman Guyton was elected Mayor of Gadsden in 2006 and re-elected in

2010. After he became mayor, Guyton wanted to address "a lot of crazy things, a lot

of spending money."  In his deposition, Guyton listed many concerns he had about

the City's costs, including:  the personnel costs in the high 70th percentile; the

implementation of GASB 45 (General Accounting Standards Board rule) requiring

the listing of long-term debt in financial statements, affecting bond eligibility; the

projected closing of Goodyear's plant;[25] depleted reserve funds being less than

monthly debt; and the City's plus-20% contribution rate for retirement (being the

second-highest in the state).

---

[25]The Goodyear plant has "protected status" meaning that "during the life of the contract
they have [with the union], they won't close the plant no matter what's going on."  (Doc. 47-2, p.
69.)  Guyton states:

> So I don't know for the future, starting next year -- it's usually three-year
> contracts -- if they will be protected, if they'll cut back. You know, right now,
> they've got a slow down nationwide on auto plants. They're laying off for a while.
> So, you know, that is a big payday and a big rollover on the money when it goes
> through. . . . Anyway, that's the thing with Goodyear. It's very big on our
> revenues, big.

(Doc. 47-2, pp. 69-70.)

Guyton stated that City officials knew that the state had passed a statute "giving [them] the option" of increasing the employee contribution for pensions. (Doc. 47-2, p. 39.)  When asked in his deposition, he agreed that, from his and the City Council's perspective, "that ended any question as to whether or not it was a permissible action."  (Doc. 47-2, p. 39.)

Personnel Director Gladden had no role in making the 2011 decision to increase pension contributions.  However, Gladden discussed the issue of increasing contributions with the Mayor, and informed him that the increase in contribution rates was not mandatory under Act 2011-676.  Gladden also explained to the Mayor's administrative assistant that the increase was optional.

Rosser testified that, although a Supplemental Fund had been created from 2002 to 2005, in 2011 she was only concerned about the 25% rate that the City was paying into the retirement fund.  (Doc. 50-1, pp. 34-35.)  She advised the City Council that the current issue was the projected budget shortfall for 2012, and that she felt the creation of the Fund was "not relevant" to that issue.  (Doc. 50-1, p. 37.)

Pursuant to Act 676, and as part of an effort to cut employee costs, Mayor Guyton and Rosser spoke with the Council and all agreed to raise employee contributions. Guyton stated that the decision to adopt the local option on pension contributions was made because "salaries and benefits being in the upper 70s of our

budget" . . . we "did several cost-cutting measures across the board."  The following exchange took place in Guyton's deposition:

> Q     Were there any other reasons considered by the City other than just basic budget management issues?
>
> A     Well, I mean, you know --
>
> MR. HOWARD: Object to the form. Go ahead. Go ahead.
>
> A     It's budget, but to keep the City sound where we can do the services and pay the people and not layoff and cut out police, cut out fire and layoff public works -- you know, a lot of cities are doing away with whole departments. We haven't had to go there on anything like that. We haven't laid anybody off or anything. We haven't extended payments. We haven't cut any services. But to keep the City sound where we can continue to deliver services, pay into the retirement, and keep everybody working, yes, it was. It was one of many things that we've done to try to keep everything where it can run smoothly.

(Doc. 47-2, pp. 42-43.)

Other than the contribution rate increase, the City addressed, or has planned to address, its budgetary shortfalls through: passing a resolution that transferred retirees from its current healthcare plan to a Medicare supplement, revising guidelines concerning the cost of healthcare for new employees, and requiring employees to absorb any increases in the costs of medical benefits; revising the guidelines concerning costs of retiree health insurance for newly retiring employees; requiring DROP program participants to pay a higher premium than other active employees;

requiring all retirees eligible for Medicare to apply for Medicare (or else pay 100 percent of the premium for City insurance); setting a minimum number of hours that an employee must accrue before selling sick leave; and having annual leave accrue on a monthly basis rather than a yearly basis. Rosser testified that "we looked at lots of [alternative] options," and deferred some until later years.

The Mayor discussed the increase in pension contributions with each Council member and the Finance Committee in the context of discussing the entire proposed budget. At the time of its adoption of the local option, the City knew that it did not have to be exercised immediately, but was irrevocable. The City knew that the local option increase would impact all employees, including those that are vested in the ERS.

What the parties refer to as a "pre-Council meeting" on the increase occurred in 2011. The parties also discuss a Finance Committee meeting that took place at about this time as well, but they are not clear as to whether this was the same meeting. Morris attended the pre-Council meeting and says that City officials could not give a reason why contribution rates should be increased. Harrelson also attended the meeting and says that the Council said the action was being taken to save the City money. The firefighters union representatives went to the meeting and requested that

the Council table the contribution increase so that it could be discussed further.[26] (Doc. 50-17, pp. 15-16.)

Union President David Putnam's concern was that the election to increase contributions was irrevocable.  However, Councilman Avery (chair of the Finance Committee) pushed for the immediate passage of the contribution increase without further discussion.  Councilman Reed asked for the matter to be tabled.  The others did not want to delay.  Councilman Reed asked whether the "finance committee was facing any type of hardship."  The response was "no, everything was in good standing, but they were going to pass it anyway."  (Doc. 50-17, pp. 16-17, 29-30.)

Putman discussed the matter with the entire Council and the Mayor.  Putman told the Council's Finance Committee that the increase in contribution rates was an unnecessary decrease in employee compensation.  Putman explained to the Council that the increase was optional and not mandatory.  Although Putman thought his argument made sense, it appeared to him that the increase was "a done deal" within the Council.  At the Finance Committee meeting, Rosser stated she was unaware of how much had been paid into the Supplemental Fund or where it had gone.  The following exchange took place:

---

[26]The defendants object to this fact stating that the witness testified that he was not present.  However, he testified that he was at the pre-council meeting.  (Doc. 50-17, p. 15.)  The line of questioning indicates that this occurred at the same meeting.  The objection is, therefore, OVERRULED.

Q.     And are you aware of any crisis or emergency or some other special circumstance that may justify the increase –

. . .

Q.     -- over 6 percent.

A.     I am not aware of anything like that.[27]

(Doc. 47-10, p. 26.)

The morning after the Finance Committee meeting, the council met to increase the pension contribution rate.  Although the parties have not been clear, this appears to be the regular (as opposed to the "pre") council meeting.  Putman urged the Council to delay the action in order to better understand the law passed by the Legislature.  He testified that, during the City Council's meeting, it was stated that the cost of City personnel was too high and the Council was looking for ways to eliminate personnel costs.  Sherrill was also at this meeting.  He testified that the City took the position at the Council meeting that it was permitted to increase rates and it would do so.  He also stated that there was no justification or reason given for the City's action.

On August 23, 2011, the Gadsden City Council passed Resolution #R-263-11, electing to "irrevocably" increase employee contributions to the ERS.  Gadsden

---

[27]The defendants object that this testimony lacks foundation and "seeks speculation." (Doc. 58, p. 24.)  The objection is OVERRULED as the witness testified to having no knowledge, nothing more.

employee contributions were raised by 2.25%, effective October 1, 2011, and an additional 0.25% after October 1, 2012, for a total increase of 2.5%.  Accordingly, the plaintiffs saw their contributions go from 6% of their wage, to 8.25%, and then to 8.5%.  Other hazardous duty City employees' contributions likewise increased from 6% to 8.25%, then to 8.5%; and "regular" City employees' contributions were raised from 5% to 7.25%, then 7.5%.  It is undisputed that, when the City passed the pension increase resolution in August 2011, it was not in a fiscal emergency. [28]

At the same time employee pension contributions were increased, the Mayor approved a 1 step salary increase of 1.25%.  The City has a pay plan with a number of grades, with each grade being comprised of 48 steps.  There is a 1.25% pay increase per step.  The Mayor makes the decision as to whether employees receive a step increase.[29]  (Doc. 47-1, p. 132.)  Rosser testified that "the only time that step increases are given is a budget [sic]."  (Doc. 47-1, p. 132.)  During the six years Mayor Guyton has been in office, the employees have received step increases five times. Putman stated that the step increases "are so minimal, obviously, the pay raises

---

[28] It is undisputed that in June 2011, Mayor Guyton told The Gadsden Times that Gadsden was in good shape financially, that City revenues were increasing and there was no realistic prospect of City bankruptcy or falling off the fiscal cliff.

[29] The original fact proffered by the plaintiffs also included that this was "a political decision."  (Doc. 49, p. 16) (citing 47-1, p. 132).  Rosser did testify as such.  However, that testimony is purely her opinion and calls for a conclusion.  It is inadmissible and will not be included.

at one and one-quarter percent, we really don't see them[.]" Guyton stated that

because of the pay raise "[the employees] really are only paying one and a quarter

percent more than the two and a half percent more."[30]  (Doc. 47-2, p. 35.)

### i.    After the Increase

Before the City Council passed the employee contribution increase, the fiscal

year 2012 budget was projected to have a $1,560,000.00 shortage (deficit). The

contribution increase addressed part of the shortage, reducing the budget gap by

$492,000.00.  In the prior year's budget, about 74% of the City's budget was for

personnel costs—salary and all benefits.  Before the contribution increase, the City's

pension contribution rate for 2012 was going to be 22.98% of payroll.[31]  The increase

in employee contribution rates resulted in a drop in the City's rate, to 20.91%.  Rosser

testified that "as far as [she knew]" even with this cut, Gadsden would still have the

second highest rate in the state.  (Doc. 50-2, p. 6.)  By eliminating the DROP program

and passing the 2.25% increase in premium contributions to the employees, Gadsden

---

[30]The plaintiffs dispute that this was done as an offset, stating that "[t]he one-step increase had been given in five of the previous six years and was routine."  (Doc. 57, pp. 8-9.) The plaintiffs provide no citation to the record to support this dispute.  The court's summary judgment scheduling order, referenced in the scheduling order entered in this case (doc. 19, p. 4), requires that "[a]ny statements of fact that are disputed by the non-movant must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." The fact is deemed to be admitted as stated by the defendants.

[31]The 1.5% drop from the prior 2011 rate of 24.54, was due to the legislature's repeal of a Deferred Retirement Option Plan ("DROP").

saved $787,500 in pension costs in FY 2012.[32]

### j.    Gadsden's Finances in 2012

In her March 2012 memorandum to the Mayor and Council, the first of FY 2012, Rosser called the increase in revenues a "very positive sign." Rosser also reported that expenses were "under budget by 4.7%."  (Doc. 55-1, p. 5.)  She also stated that "other less significant General Fund revenues were down;" and, that the cost of gasoline "controls everything and with our large fleet of trash trucks, transportation vehicles, trolleys and just the cost of cutting grass in the summer, our costs will have to be cut if gas costs continue to increase at this rate." (Doc. 55-1, p. 5.)

In her May 9, 2012, report, Rosser stated that Gadsden is "truly blessed" compared to the financial condition of other municipal governments.  (Doc. 55-1, p. 7.) Rosser again submitted a positive financial report to the Mayor and Council on July 6, 2012. (Doc. 55-1, p. 7.)

The City finished FY 2012 in better financial condition than it anticipated. Indeed, Gadsden was in better financial condition in 2012 than when Mayor Guyton first came into office.  During FY 2012, the City offered an early retirement buyout

---

[32]In handwritten notes that Rosser testified she gave to the city council, she wrote: "One could think with an unstable economy and the retirement system being under-funded that this rate would go up, but again that is an unknown factor."  (Doc. 50-3, p. 71.)

program to employees that cost the City $1.5 million.

### k.      "Soundness" of the ERS

An increase in the employee's contribution rate does not necessarily correspond with a decrease in the employer's rate.   It depends on a number of circumstances at the overall level and at the local level.   On both levels, it could go up if necessary to maintain fiscal soundness.

Actuarial soundness of the fund overall, or of a portion thereof, is determined by how much money the entity presently possesses to pay its projected obligations in the future.   One hundred percent funding would be the most actuarially sound. Gadsden has 54 cents on the dollar to pay its projected obligations in the future.[33]

During her deposition, Scott agreed that "to try to evaluate whether it was good fiscal policy for the City to adopt the increase, that's going to be a different evaluation than this – than evaluating any actuarial soundness."  (Doc. 47-5, p. 87.)

Generally, the ERS has used an actuarial assumption of an investment rate of return of eight percent (8%).   A poor investment year, one in which that return is not made, will result in increased employer contribution rates, although the ERS's actuarial formulas are designed to "smooth out" the bad years and "smooth out" the

---

[33]The original sentence, offered by the defendants, included the following: "which is not actuarially sound."  (Doc. 51, p. 11.)  The plaintiffs correctly objected to this language because it relies upon an inadmissible expert opinion offered by a lay witness.

good years, leveling the funding to avoid extreme changes for funding units.  Thus, a poor investment year (for the ERS) "will hurt … somewhat" over a period of five years.

### l.    Miscellaneous

Steve Carroll is Chief of the Gadsden Fire Department.  Carroll was employed by Gadsden as Fire Chief in August 1999.  He previously worked for the City of Birmingham as a firefighter for 22 years.  When Chief Carroll was hired in 1999, he began participating in the ERS rather than the PFRF.  As an employee with more than ten years of service, Chief Carroll considers himself as having vested rights in the ERS.  Carroll may retire now and has the right to begin receiving benefits at age 62. Carroll's contribution to the ERS has increased from 6% to 8.5%.  He has received no change in benefits or other remuneration for the increased contribution.  Every other member of the Fire Department is also paying the increased contribution.  Fire Chief Carroll had no role in the decision of the City to increase pension contributions.

Matlock was fully vested in the ERS when the City raised the contribution rate in 2011.  He had to pay more for his pension, but the benefits of the plan did not change. Matlock and every other Gadsden Fire Department employee is paying an additional 2.5% of their salary towards the pension fund.  (Doc. 50-12, p. 32.)

It is undisputed that no employee has received additional benefits as a result

of the increased contributions.

### 2.    *The Defendants' Motion for Summary Judgment*

In this case, the plaintiffs contend that "the recent action of the City of Gadsden to increase the required pension contributions of firefighter employees from 6% to 8.25% of earnable compensation, as authorized by a recent act of the Alabama Legislature, constitutes an unlawful impairment of contractual obligations violative of Art. I, section 10 of the Constitution of the United States and Section 22 of the Constitution of the State of Alabama."  (Doc. 1, p. 1.)

### a.    **Contract Clause Law**

The Contract Clause of the United States Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."  U.S. Const., Art. I, § 10, cl. 1.  Judicial analysis of a Contract Clause claim has developed over time into several steps.  In *General Motors Corp. v. Romein*, 503 U.S. 181 (1992), the Supreme Court unanimously outlined the following framework for the initial evaluation of a claim brought under the Contract Clause:

> Generally, we first ask whether the change in state law has "operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978); *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983).   This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.

*Id.* at 186; *accord Reliable Tractor, Inc. v. John Deere Constr. & Forestry Co.*, 376 Fed. App'x 938, 941 (11th Cir. 2010) (recognizing three components of Contract Clause analysis set out in *Romein*).   Federal law ultimately controls the analysis of whether there is a contract at issue.   *Romein*, 583 U.S. at 186 ("The question whether a contract was made is a federal question for purposes of Contract Clause analysis, and whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment."); *Reliable Tractor*, 376 Fed. App'x at 941 ("Because we are asked to interpret the United States Constitution, federal law controls this inquiry."); *Ind. ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 82 L.Ed. 685 (1938) ("This court is bound to decide for [itself] whether a contract was made, what are its terms and conditions, and whether the state has, by later legislation, impaired its obligation.").   Still, the court must accord "respectful consideration and great weight to the views of the State's highest court...." *Romein,* 503 U.S. at 187,  (quoting *Brand,* 303 U.S. at 100, 58 S.Ct. 443); *see also Phelps v. Bd. of Educ. of Town of West New York,* 300 U.S. 319, 322, 57 S.Ct. 483, 81 L.Ed. 674 (1937); *Dodge v. Bd. of Educ. of City of Chicago,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937); *United States v. Nason*, 269 F.3d 10, 18 (1st Cir. 2001); *Pineman v. Fallon*, 842 F.2d 598, 599 (2d Cir. 1988); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 437 (8th Cir. 2007); *Robertson v. Kulongoski*, 466 F.3d

1114, 1118 (9th Cir. 2006).

The inquiry does not end when the court finds a contractual relationship and a change in law that substantially impairs that contractual relationship.  To survive Contract Clause review, a legislative enactment that constitutes a substantial impairment of a contractual relationship must have a "significant and legitimate public purpose." *Energy Reserves Grp.,* 459 U.S. at 411 (citation omitted); *accord Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 989 (11th Cir. 2001)[34] (considering whether the enactment is "necessary to meet an important government interest"); *Davken v. City of Daytona Beach Shores, Fla.*, 366 Fed. App'x 40, 41 (11th Cir. 2010) ("A regulation does not violate the Contract Clause so long as it serves a 'significant and legitimate public purpose' . . . ." (citing *Energy Reserves Grp.,* 459 U.S. at 411-12)).  The significant and legitimate public purpose may include "the remedying of a broad and general social or economic problem." *Energy Reserves Grp.,* 459 U.S. at 412.  However, "the public purpose need not be addressed to an emergency or temporary situation." *Id.*

"Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is

---

[34] *Flanigan's Enterprises* was subsequently superceded on other grounds by statute, Fulton County, Ga., Code § 18-79(17) (2001), as recognized in *Flanigan's Enterprises, Inc. v. Fulton County*, 596 F.3d 1265, 1269 (11th Cir. 2010).

based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Id.* (quoting *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977)).

In sum, therefore, a law or regulation that substantially impairs a contractual relationship does not violate the Contract Clause so long as it serves a significant and legitimate public purpose, is based on reasonable conditions, and is appropriate to the public purpose justifying its enactment. *Davken*, 366 Fed. App'x at 41 (citing *Energy Reserves Grp.,* 459 U.S. at 411-12).

Article I, § 22 of the Alabama Constitution of 1901 states "[t]hat no . . . law . . . impairing the obligations of contracts . . . shall be passed by the legislature . . . ." Ala. Const. Art. I, § 22 (1901).  No party has cited, and this court has not found, Alabama authority on the method by which to analyze this clause.  However, at least one opinion of the Alabama Supreme Court has recognized that the purpose of the Alabama Contract Clause is the same as the federal Contract Clause: "to preserve sacred the principle of the inviolability of contracts against that legislative interference [that] the history of governments has shown to be so imminent, in view of the frequent engendering of popular prejudice, and the consequent fluctuations of popular opinion." *Opinion of the Justices No. 333*, 598 So. 2d 1362, 1365 (Ala. 1992) (citing *Edwards v. Williamson*, 70 Ala. 145, 151 (1881)).  In light of that

64

opinion, the court will analyze both clauses using the *Romein* methodology.

The defendants first argue that neither the Alabama legislature nor the City of Gadsden created a contractual relationship with the plaintiffs. They then argue that, if either did create such a relationship, requiring the plaintiffs to increase their contributions did not substantially impair the contractual relationship. Finally, the defendants argue that even if a substantial impairment of a contractual relationship exists, the acts of the legislature and the City are justified as reasonable and necessary to serve an important public purpose.

### b.    Do the Plaintiffs Have a Contract With the City of Gadsden?

The plaintiffs seem at times to argue that both the State, through its enactments, and the City of Gadsden entered into a contract with them.  Importantly, the State of Alabama is not a defendant in this case.  Still, the complaint could be fairly read to say that the City created contractual rights in the plaintiffs when it adopted a pension program created by the State.  The plaintiffs also allege a contract with the City of Gadsden based upon its actions in merging the PFRF with the ERS.

### (1)    Actions By the Legislature

The plaintiffs do not set out one specific act of the legislature which they contend establishes contractual rights.  Instead, they refer to numerous statutes and the RSA handbook.

65

Since they allege that Act 676, which increases the plaintiffs' contributions to the retirement plan, unconstitutionally interferes with their contract rights, the logical place to begin the analysis as to whether a contract was created is the statute which established the contribution rates in the first place, Ala. Code § 36-27-59(b)(2). That statute states:

> Effective January 1, 2001, and each pay period thereafter, each active employee who is a firefighter, law enforcement officer, or correctional officer, as defined in subsection (a), shall contribute to the Teachers' or Employees' Retirement System of Alabama <u>six percent</u> of his or her earnable compensation.

Ala. Code § 36-27-59(b)(2) (emphasis added).  The plaintiffs argue:

> As plaintiffs first observed in their Complaint, doc. no 1, the retirement system created by the Legislature creates a "trust" and the "Board of Control of . . . the Employees Retirement System of Alabama shall have vested in [it] all powers necessary to fulfill [its] fiduciary duty as trustee[] to members . . ." Ala. Code section 36-27-2.

(Doc. 57, p. 22.)  The full clause of Ala. Code 36-27-2 actually reads:

> The Board of Control of the . . . the Employees' Retirement System of Alabama shall have vested in them all powers necessary to fulfill their fiduciary duty as trustees to members of each respective system including the power to sue and be sued, complain and defend in their own names[.]

Ala. Code § 36-27-2.  The plaintiffs also argue that "localities may elect to join the ERS, but only with the approval of the ERS and the employees employed at the time the locality joins the ERS."  (Doc. 57, p. 22) (citing Ala. Code. § 36-27-6(k)).

The plaintiffs also cite 36-27-6(f), which provides:

> The actuary of the retirement system shall compute the rates of contributions payable by employees who become members under the provisions of this section in the same manner as if they were state employees and shall compute the contributions which would be payable annually by the employer on behalf of such members as though they were state employees; except, that each employer of members participating in the system as provided in this section shall make a special accrued liability contribution on account of the participation of its officers and employees in the retirement system which shall be determined by an actuarial valuation of the accrued liability on account of the employees of such employer who elected to become members, in the same manner as the accrued liability rate was originally determined for state employees. This special accrued liability contribution, subject to such adjustment as may be necessary on account of any additional prior service credits awarded to employees of such employer, shall be payable in lieu of the accrued liability contribution payable on account of other employees in the system. The expense of making such initial valuation shall be assessed against and paid by the employer on whose account it is necessary. The contributions so computed, together with a pro rata share of the cost of the administration of the retirement system, based upon the payroll of the employees, shall be certified by the Board of Control to the chief fiscal officer of the employer. The amounts so certified shall be a charge against the employer. The chief fiscal officer of each such employer shall pay to the State Treasurer the amount certified by the board as payable under the provisions of this section, and the State Treasurer shall credit such amounts to the appropriate funds of the retirement system.

Ala. Code § 36-27-6(f).  They argue that "Gadsden has been responsible to pay the unfunded liability from day one.  These liabilities which Gadsden seeks to pass on to its employees are Gadsden's responsibility under the statute."  (Doc. 57, p. 23.)

Then, without quoting specific language, the plaintiffs cite Ala. Code § 36-27-

24, for the proposition that "[t]he statute further provides for retirement and disability

benefits for plan participants."  (Doc. 57, p. 23.)  They then write:

> Those rights vest in employees at ten years of service.   When the
> Legislature chose to revise those benefits in 2012, it made the revisions
> prospectively applicable only to "Tier II employees" first employed after
> January 1, 2013. See, doc. no. 50-35 (Ala. Act 2012-377). Clearly, the
> Legislature recognized in 2012 that the alteration of vested rights was
> problematic.

(Doc. 57, p. 23.)

The plaintiffs then incorporate by reference the law cited in their brief in

support of their own motion for summary judgment.  In that brief, the plaintiffs argue

that "[t]here should be no dispute that the provisions of the Alabama ERS pension

plan are contractual in nature to create vested and enforceable rights." (Doc. 49.) The

plaintiffs argue that

> the plain language of the statute supports the notion that the system
> creates a "trust" with "vested" rights which are enforceable by
> participants.   Second, the pension plan as administered provides
> enforceable rights which vest in participants.

(Doc. 49, p. 53-54.)

The plaintiffs argue that the statute states that "[a]ll persons who shall become

employees after October 1, 1945, shall become members of the retirement system as

a condition of their employment."   Ala. Code § 36-27-4.   They then argue that

employees are "vested in the right to receive pension benefits" after a certain point.

(Doc. 49, p. 52) (citing Ala. Code § 36-27-16(a)(1)).   The section cited by the

plaintiffs does not actually use the word "vested," stating:

> Any Tier I plan member who withdraws from service upon or after attainment of age 60 . . . may retire . . . provided, that any such member who became a member on or after October 1, 1963, shall have completed 10 or more years of creditable service. . . . [A]ny Tier I plan member of the Employees' Retirement System who withdraws from service after completion of not less than 25 years of creditable service may retire without a reduction in retirement allowance.[35]

Ala. Code § 36-27-16(a)(1)(a), (c).

The plaintiffs then point to the following sections of  Ala. Code § 36-27-6:

> The governing board of any . . . city . . . may, by resolution legally adopted to conform to rules prescribed by the Board of Control, elect to have its officers and employees from whatever sources and in whatever manner paid become eligible to participate in the retirement system.

Ala. Code § 36-27-6(a);

> Membership shall be compulsory for all employees entering the service of such employer after the date participation becomes effective.

Ala. Code § 36-27-6(c);

> Employees who become members under this section and on behalf of whom contributions are paid as provided in this section should be entitled to the benefits under the retirement system as though they were state employees.

Ala. Code § 36-27-6(g);

---

[35]The plaintiffs mistakenly cite to this last sentence as coming from Ala. Code § 36-27-16(c).  It actually comes from Ala. Code § 36-27-16(a)(1)(c).

The agreement of any employer to contribute on account of its employees shall be irrevocable, but should an employer for any reason become financially unable to make the normal and accrued liability contributions payable on account of its employees, then such employer shall be deemed to be in default. All members of the retirement system who were employees of such employer at the time of default shall thereupon be entitled to discontinue membership in the retirement system and to a refund of their previous contributions upon demand made within 90 days thereafter

Ala. Code § 36-27-6(h).

The plaintiffs also cite to the statute setting out the contribution percentages,

which reads:

Effective January 1, 2001, and each pay period thereafter, each active employee who is a firefighter, law enforcement officer, or correctional officer, as defined in subsection (a), shall contribute to the Teachers' or Employees' Retirement System of Alabama six percent of his or her earnable compensation. For all pay dates beginning on or after October 1, 2011, each active employee who is a firefighter, law enforcement officer, or correctional officer, as defined in subsection (a), except those employees participating pursuant to Section 36-27-6, shall contribute to the Teachers' or Employees' Retirement System of Alabama eight and one-quarter percent (8.25%) of his or her earnable compensation. For all pay dates beginning on or after October 1, 2012, each active employee who is a Tier I plan member and who is a firefighter, law enforcement officer, or correctional officer, as defined in subsection (a), except those employees participating pursuant to Section 36-27-6, shall contribute to the Teachers' or Employees' Retirement System of Alabama eight and one-half percent (8.5%) of his or her earnable compensation. Any employer participating under Section 36-27-6, by adoption of a resolution, may elect for the increases in employee contributions provided by Act 2011-676 to be withheld from the earnable compensation of employees of the employer.

Ala. Code § 36-27-59(b)(2).   The plaintiffs also cite generally to Ala. Code §

36-27-24(c)-(e) for the proposition that "[t]he employer's total contribution obligation

or rate is established after each annual actuarial valuation of participating agencies."

(Doc. 49, p. 55.)

> Lastly, the plaintiffs write:
>
>> As implemented, the documents provided by RSA and ERS to participants also speak in terms of "vested" rights. The ERS Handbook provides a summary of plan benefits and obligations for participants. The handbook describes how the plan is a "defined benefit program", participation is "mandatory" and employees are vested after ten years. The Handbook has long stated:
>>
>>> Vesting means the member has earned enough service credit to be eligible for a lifetime retirement benefit other than a refund of contributions. Members have a vested status in the ERS after accumulating 10 years of creditable service. . . .
>>
>> Handbook, page 10. Plainly, employees with "vested" rights have rights which are based on promises by the RSA and the employer and which the law deems are enforceable. Federal law recognizes such obligations as contractual in nature.

(Doc. 49, pp. 53-54.)

### (2)    Actions By the City of Gadsden

The plaintiffs argue that Gadsden's actions "of negotiating an agreement for

the merger of the former PFRF into the ERS," resulted in an agreement that "the

employees rate of contribution would revert to the State's default rate of 6% in 2006."

(Doc. 57, pp. 25-26.)  They claim that the payment of the 11% for three years "was

71

a quid pro quo" and "the agreement provided that after 2005 the employees would pay the regular statutory contribution rate." (Doc. 57, p. 26.) They argue that Gadsden did not have to exercise the local option and when it did that was "a plain violation of the contract it made with its employees when the City and employees both voted to approve the ERS merger." (Doc. 57, p. 26.)

> **(3)** **Do the ERS Provisions Create, In Favor of the Plaintiffs, a Contractual Right to Never Be Required to Pay More Than 6% of Their Pay Towards The System?**

A statutory enactment is generally presumed not to create "contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,* 470 U.S. 451, 456–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quotations omitted). "[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights.'" *National R.R. Passenger Corp. v. Atchinson, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985) (quoting *Dodge v. Board of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 82 L.Ed. 57 (1937)).

> Where a public contract allegedly arises out of statutory language, the hurdle under the first component of the first part of the test—proving that a contractual relationship exists—is necessarily higher, since "normally state statutory enactments do not of their own force create a contract with those whom the statute benefits."

72

*Parella v. Ret. Bd. of Rhode Island Employees' Ret. Sys.*, 173 F.3d 46, 60 (1st Cir. 1999) (*quoting Hoffman v. City of Warwick*, 909 F.2d 608, 614 (1st Cir. 1990) (*in turn citing National Railroad Passenger Corp.*, 470 U.S. at 465-66)).  "In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State."  *Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 552 (8th Cir. 1997) (*citing United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1516, 52 L.Ed.2d 92 (1977)).

> This threshold requirement for the recognition of public contracts has been referred to as the "unmistakability doctrine." *See McGrath,* 88 F.3d at 19 (citing *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)). In *United States v. Winstar,* the Supreme Court traced the history of the unmistakability doctrine from Justice Marshall's opinion in *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), and explained its purpose. Because legislatures should not bind future legislatures from employing their sovereign powers in the absence of the clearest of intent to create vested rights protected under the Contract Clause, courts developed canons of construction disfavoring implied governmental contractual obligations. Thus, " 'neither the right of taxation, nor any other power of sovereignty, will be held ... to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.' " *Winstar,* 518 U.S. at ——, 116 S.Ct. at 2455 (quoting *Jefferson Branch Bank v. Skelly,* 66 U.S. (1 Black) 436, 446 (1861)). The requirement that "the government's obligation unmistakably appear thus served the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of State authority to limit the subsequent exercise of legislative power." *Winstar,* 518 U.S. at ——, 116 S.Ct. at 2455.

*Parker v. Wakelin*, 123 F.3d 1, 5 (1st Cir. 1997).

The Eleventh Circuit has not addressed this issue of whether the ERS, or any other governmental pension plan, creates contractual rights in the employee participants.  However, the issue has been addressed elsewhere, and in many different ways.  Indeed, in 1997, the First Circuit noted that "[t]he law governing the rights of members of public employee retirement plans varies greatly from state to state, and has not been the subject of federal regulation or harmonization."  *Parker*, 123 F.3d at 6.

The most recent Supreme Court case on this issue appears to be *Dodge v. Bd. of Educ. of City of Chicago*, 302 U.S. 74, 75, 58 S. Ct. 98, 82 L. Ed. 57 (1937).  In *Dodge*, the Supreme Court examined certain acts of the Illinois legislature beginning with a 1926 act, known as the Miller Law, which

> provided for compulsory retirement and for the payment of annuities to retired teachers. By section 1 the Board of Education was directed to retire teachers from active service on February 1 and August 1 of each year according to the following program: In 1926, those 75 years of age or over; in 1927, those 74 years of age or over; in 1928, those 73 years of age or over; in 1929, those 72 years of age or over; and in 1930, and in each year thereafter, those 70 years of age or over. Section 2 (Smith-Hurd Ill.Stats. c. 122, § 614b) provided: 'Each person so retired from active service who served in the public schools of such city for twenty or more years prior to such retirement, shall be paid the sum of fifteen hundred dollars ($1,500.00) annually and for life from the date of such retirement from the money derived from the general tax levy for educational purposes.'

*Dodge*, 302 U.S. at 76.  The Court noted that the law had

> two provisos; the one requiring that the annuitant should be subject to
> call by the superintendent of schools for consultation and advisory
> service, and the other declaring that the annuity granted by the act was
> not to be in lieu of, but in addition to, the retirement allowance payable
> under existing legislation.

*Id.*

> In 1927, a third section was added permitting teachers who had served
> for 25 years or more, and were 65 years of age or over, who had not
> reached the age of compulsory retirement, to be retired upon request and
> to be paid from $1,000 to $1,500 per annum, depending upon age at
> retirement.

*Id.*  In 1935, the law was amended again, reducing to $500 "the annuities of teachers

theretofore retired, or eligible for retirement under the Miller Law, as well as those

to be retired subsequent to its enactment."  *Id.* at 77.  The plaintiffs consisted of those

"who were compulsorily retired under the Miller Law; those who voluntarily retired

under the law as amended; and those eligible for voluntary retirement who had

signified their election to retire prior to July, 1935."  *Id.*

Despite language in the statute that "[e]ach person so retired . . . shall be paid

the sum of fifteen hundred dollars ($1,500.00) annually and for life," and "persons

65 years of age or over shall upon their own request be retired * * * and thereafter be

paid annuities for life," the court found no contractual rights to the annuity at the

$1,500.00 figure.  *Id.* at 80.  In so doing, the Court noted that

> [t]he presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise. He who asserts the creation of a contract with the state in such a case has the burden of overcoming the presumption.

*Id.* at 79.  The *Dodge* case's rationale  seems in line with *Pennie v. Reis*, 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426 (1889), the Supreme Court's only other pronouncement on this issue, where the court held that public employee pension programs do not create vested rights against legislative modifications, and thus are gratuities that a state may freely revoke.  The parties have not cited, and the court has not found, a Supreme Court decision where the Court has held that a public pension statute creates a contract.[36]

> Noting that "times have changed," the First Circuit determined that
>
> evolving legal doctrine recognizes that the promise of a pension is part of the compensation package that employers dangle to attract and retain qualified employees. In line with this evolving doctrine we have held that, in general, pensions are to be regarded as a species of unilateral contracts.

*McGrath v. Rhode Island Ret. Bd.*, 88 F.3d 12, 16-17 (1st Cir. 1996).  Accordingly, in that circuit, public pension plans, even if non-contributory, create contract rights

---

[36]A recent review of the law in this area finds that "the Court has never held that a pension statute creates a contract."  Amy B. Monahan, *Statutes As Contracts? The "California Rule" and Its Impact on Public Pension Reform*, 97 Iowa L. Rev. 1029, 1046 (2012).

in the participants.  This rule has been recognized in other circuits as well.  *See, State of Nev. Employees Ass'n, Inc. v. Keating*, 903 F.2d 1223, 1227 (9th Cir. 1990) (non-vested public employees have contractual rights in pension plans "subject to reasonable modification in order to keep the system flexible to meet changing conditions, and to maintain the actuarial soundness of the system."); *Pratt v. Petroleum Prod. Mgmt. Inc. Employee Sav. Plan & Trust*, 920 F.2d 651, 661 (10th Cir. 1990) ("A 'pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years.'") (quoting *Hurd v. Illinois Bell Tel. Co.*, 234 F.2d 942, 946 (7th Cir.), *cert. denied*, 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956)); *Transp. Workers Union of Am., Local 290 By & Through Fabio v. Se. Pennsylvania Transp. Auth.*, 145 F.3d 619, 624 (3d Cir. 1998) (citing to *McGrath* for the proposition that contractual rights are created in employees "who have satisfied the plan requirements for retirement benefits").  *See also, Bd. of Trustees of Policemen's & Firemen's Ret. Fund of City of Gadsden v. Cary*, 373 So. 2d 841, 842 (Ala. 1979) (discussing pension plans as unilateral contracts); *but see*, *Spiller v. State*, 627 A.2d 513, 516 (Me. 1993) (absent clear legislative intent to create contract rights, no entitlement to benefits); *Budge v. Town of Millinocket*, 2012 ME 122, 55 A.3d 484, 490 (Me. 2012) (because no legislative enactment by the Town used express language

77

to create contractual rights, the employees cannot prevail on their claim for breach of contract as to benefit reductions).  Further, as to the very system at issue in this case, the ERS, the Alabama Supreme court has found contract rights to benefits created. *Snow v. Abernathy*, 331 So. 2d 626, 631 (Ala. 1976).[37]

Still, the First Circuit has pointed out that

though the principle that a pension plan represents an implied-in-fact unilateral contract is fairly well settled and has been applied repeatedly to state and municipal pension plans, there is significant disagreement about when contractually enforceable rights accrue under such plans. *See, e.g., Nevada Employees Ass'n, Inc. v. Keating,* 903 F.2d 1223, 1227 (9th Cir.) (suggesting that nonvested employees have contractual rights subject only to "reasonable modification"), *cert. denied,* 498 U.S. 999, 111 S.Ct. 558, 112 L.Ed.2d 565 (1990); *Betts v. Board of Admin. of the Pub. Employees' Ret. Sys.,* 21 Cal.3d 859, 148 Cal.Rptr. 158, 161, 582 P.2d 614, 617 (1978) (en banc) (stating that the right to a "substantial" or "reasonable" pension accrues on first day of employment); *Petras v. State Bd. of Pension Trustees,* 464 A.2d 894, 896 (Del.1983) (explaining that rights accrue when vesting occurs); *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467, 475 (1980) (similar to *Petras,* but adding that rights remain subject to "reasonable modification"); *Sylvestre v. State,* 298 Minn. 142, 214 N.W.2d 658, 666-67 (1973) (taking the position that an employee's rights accrue on first day of employment); *Baker v. Oklahoma Firefighters Pension & Ret. Sys.,* 718 P.2d 348, 353 (Okla.1986) (holding that rights accrue only when an employee vests); *Leonard v. City of Seattle,* 81 Wash.2d 479, 503 P.2d 741, 746 (1972) (en banc) (similar to *Baker* ). And, moreover, some courts cling to the notion that a state-sponsored retirement plan for public employees creates no enforceable contractual rights whatever. *See, e.g., Pineman v. Oechslin,* 195 Conn. 405, 488 A.2d 803, 809-10 (1985); *Spiller v.*

---

[37]This does not end the matter, since the issue in the instant case is not whether the plaintiffs had a right to their <u>benefits</u>, which have not been changed, but instead whether they had a contractual right to never have their contribution rate increased.  *See infra.*

*State,* 627 A.2d 513, 516 (Me.1993).

*McGrath v. Rhode Island Ret. Bd.*, 88 F.3d 12, 17 (1st Cir. 1996).

Importantly, none of these cases stand for the proposition that <u>all</u> public pension plans <u>always</u> create contract rights, as to <u>every</u> facet of the plans.  Indeed, in *Parker v. Wakelin*, 123 F.3d 1, 7 (1st Cir. 1997), the First Circuit noted:

> It may well be that the variety of approaches adopted by state supreme courts reflect, in part, differences in the structure of the various state pension programs, and of the intention of the different state legislatures that created them. <u>There is a danger . . . in adopting a theory of pension rights and subsequently forcing a given program to fit under it.</u>  Any given theoretical approach will make assumptions regarding the intent of legislatures to be bound, as well as the time at which vesting should occur, which may be contradicted by particular statutory provisions such as, for example, an express reservation of the right to revoke pension benefits. <u>When reviewing a particular enactment, therefore, we must suspend judgment and "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.</u>"

*Id.* at 7-8 (quoting *Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. at 466, 105 S.Ct. at 1452) (emphasis added).  Accordingly, a review of the particular language at issue in this case, as well as the particular infringement alleged, is critical as the court "decide[s] for [itself] whether a contract was made, what are its terms and conditions, and whether the state has, by later legislation, impaired its obligation."  *Ind. ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 82 L.Ed. 685 (1938).

Here, the court has no trouble finding no contractual rights were created.  The

plaintiffs have cited no statutory language, handbook provisions, or other materials,[38] which reflect "a clear intent by the legislature to create contractual rights." In other words, there is no indication that the legislature, and therefore the City, unmistakably has bound itself to <u>never</u> changing the contribution rate.

The defendants have cited two very persuasive cases where courts held that there was no contract right to prevent an increase in such contributions. They are *Parker v. Wakelin*, 123 F.3d 1 (1st Cir. 1997), and *Scott v. Williams*, 107 So. 3d 379 (Fla. 2013).

In *Parker v. Wakelin*, 123 F.3d 1 (1st Cir. 1997), in a very similar circumstance to the instant case, the First Circuit dealt with Maine's public retirement system (the "MSRS"). The following section of the opinion demonstrates that the plan was very similar to the ERS:

> The MSRS operates as a public pension trust pursuant to Maine's public employee retirement benefit statute. The MSRS was created in 1942 to encourage "qualified persons to seek public employment and to continue in public employment in their productive years." For all Maine state employees, including the public school teachers comprising the plaintiff class in the instant case, membership in the MSRS is mandatory. All MSRS members make mandatory contributions into a pension fund. The State of Maine also contributes annually to maintain the fund's actuarial soundness with regard to future benefit obligations. The MSRS can be classified as a "defined benefit system," in that the

---

[38]The plaintiffs have cited to the RSA Handbook. By referencing it here, the court does not imply, as the plaintiffs do, that the handbook became part of the statute.

retirement benefits provided for teachers are defined upon employment and financed in part by their fixed contributions into the system.

The teachers, as members of the system, qualify to receive retirement benefits upon (1) reaching the statutory retirement age, *and* (2) satisfying *either* of the following service requirements: (a) at least ten years of creditable service; or (b) at least one year of creditable service prior to reaching the statutory retirement age while in public service. Alternatively, a member may be entitled to receive retirement benefits when he or she retires after performing at least 25 years of creditable service. In the district court's decision, the term "vesting" was used to describe the satisfaction of the service requirements. However, as the district court in fact noted, the term "vesting" does not figure in the statutory scheme itself, which simply indicates the age and service requirements that must be met. Members who terminate their public service prior to satisfying the pension eligibility requirements are entitled to a return of their contributions, with interest.

An eligible retiree earns a pension in the amount of two percent of his or her "average final compensation" multiplied by the number of years of total creditable public service (up to 25 years).

*Parker*, 123 F.3d at 2-3 (citations and footnotes omitted).  Maine amended the plan in a very similar way to the amendments in the instant case, increasing the rate of required member contributions from 6.5% of their salary to 7.65%.[39]   *Id.* at 3. Further, as in the instant case, it was not disputed that the plan participants received no additional benefits as a result of the increase.  *Id.* at 3.  Lastly, as in the instant

---

[39]The amendments also included "a cap on the salary increase that may be included in the course of calculating the level of teachers' retirement benefits; and . . .  a six-month delay in the first cost-of-living adjustment of retirement benefits."  *Parker*, 123 F.3d at 3.

case, the State of Maine "concede[d] that the sole purpose for enacting the changes in the terms and conditions of retirement benefits . . . was to save money by lowering budget allocations by the state to the trust funds of the MSRS; their enactment coincided with other responses to a state fiscal crisis." *Id.* at 3.

The trial court held that the amendments violated the Contract Clause only as applied to MSRS members whose benefits had "vested" under the system. The court explained that, when the district court used the term "vested," "the district court referred to those MSRS members who had satisfied the service requirements under the system--a service requirement is a necessary (but not a sufficient) condition to being entitled to actually receive a pension." *Id.* at 4. Its decision was based in part on a 1975 enactment by the Maine legislature which provided:

> No amendment to this chapter shall cause any reduction in the amount of benefits which would be due to the member based on creditable service, compensation, employee contributions and the provisions of this chapter on the date immediately preceding the effective date of such amendment.

*Id.* at 3-4. A similar provision is conspicuously absent in the instant case.

The First Circuit reversed, writing that "the line [the district court] drew between teachers who had and had not completed a minimum service requirement, cannot be justified on the basis of the Maine statute, which nowhere speaks of 'vesting' as understood by the district court." *Id.* at 8. The court recognized that the

language prohibiting a reduction in the amount of benefits "due" was a point of contention.  It noted:

> The plaintiff[s] . . . argue that benefits are "due" from the moment of employment, and that this section merely confirms the applicability of a strict implied-in-fact, unilateral contract approach. The State contends that [the] section . . . is a reservation of the power to alter benefits until the retirement benefits are literally due to be received. The third alternative, not the basic position of either party, is that benefits are "due" if a teacher has completed the statute's initial service requirements, although pension benefits are not yet currently payable.

*Id.* at 8.  The court held "we cannot find that the legislature as a whole unmistakably intended to create contract rights at the time that service requirements were satisfied—especially where, as here, it would have been easy to make any such intention crystal clear."  *Id.* at 9.

The court finds *Parker* to be very persuasive in light of the fact that it dealt with a similar system, with similar "vesting" terminology, and a similar alleged breach; the increase in contributions.  The case is especially persuasive in light of the fact that no contract rights were found, even though there was an express statutory provision prohibiting the alteration of benefits–something not present in the instant case.

The plaintiffs attempt to distinguish *Parker* because "it ultimately decided the case based on an analysis of the Maine statute at issue." (Doc. 57, p. 18.)  The court finds no merit in this argument as all such cases <u>must</u> be based on the particular

language of the statute before a court.  While mindful of the need to address the

statutes at issue on their own merits, the court still finds the First Circuit's analysis

helpful, as the case has very similar facts to the instant case.

Another similar case, this time on the state level, is *Scott v. Williams*, 107 So.

3d 379 (Fla. 2013), where the Florida Supreme Court dealt with this very issue in the

context of the Florida Retirement System.  In *Scott*, the Florida legislature passed a

law which "converted the Florida Retirement System (FRS) from non-contributory

by employees to contributory, required all current FRS members to contribute 3% of

their salaries to the retirement system, and eliminated the retirement cost-of-living

adjustment for creditable service after the effective date of the act."  *Scott*, 107 So.

3d at 381.  The trial court held that the law violated three separate provisions of the

Florida Constitution, one of which was article I, section 10, which prohibited laws

impairing the obligation of contracts.  *Id.* at 381-82.  The trial court held "that the

rights of the members of the FRS to the non-contributory retirement plan with a

COLA, which was in effect prior to the amendments, were contractual in nature, that

they were legally enforceable as valid contract rights, and could not be abridged in

any way."  *Id.* at 383.  It did so in part because the statute contained a "preservation

of rights" section which provided:

> [t]he rights of members of the retirement system established by this
> chapter shall not be impaired by virtue of the conversion of the Florida

Retirement System to an employee non[-]contributory system. As of July 1, 1974, the rights of members of the retirement system established by this chapter <u>are declared to be of a contractual nature, entered into between the member and the state, and such rights shall be legally enforceable as valid contract rights</u> and shall not be abridged in any way.

*Id.* at 383 (emphasis added).[40]  The trial court held that

the Legislature substantially breached the employees' contract rights <u>guaranteed by the preservation of rights statute</u> by requiring employee contributions to the FRS and by elimination of the COLA, and further held that this breach was not justified by the existence of a significant budget shortfall where other, reasonable alternatives existed to preserve the State's contract with FRS members.

*Id.* at 383-84 (emphasis supplied).

The Florida Supreme Court noted that the legislature had enacted the statute creating contract rights in the plan after the Florida courts had allowed "both prospective and retroactive changes to retirement benefits already earned." *Id.* at 387-388.  It then cited *Florida Sheriffs Ass'n v. Dep't of Admin., Div. of Ret.*, 408 So. 2d 1033, 1037 (Fla. 1981), where the court had noted:

We stress that the rights provision was not intended to bind future legislatures from prospectively altering benefits which accrue for future state service. To hold otherwise would mean that no future legislature could in any way alter future benefits of active employees for future services, except in a manner favorable to the employee. This view would, in effect, impose on the state the permanent responsibility for maintaining a retirement plan which could never be amended or repealed irrespective of the fiscal condition of this state. Such a decision could

---

[40]Again, this is language not present in the statutes at issue in this case.

85

lead to fiscal irresponsibility. It would also impose on state employees an inflexible plan which would prohibit the legislature from modifying the plan in a way that would be beneficial to a majority of employees, but would not be beneficial to a minority. Since two different plans cannot exist for the same type of employee, the implementation of appellants' contention would also bind the legislature to this plan for future employees. We find appellants' contention is not in accordance with the intent of the legislature and conclude that the legislature has the authority to modify or alter prospectively the mandatory, noncontributory retirement plan for active state employees.

*Id.* at 388 (*quoting Florida Sheriffs Ass'n*, 408 So. 2d at 1037). The *Scott* court then held:

[T]he preservation of rights statute was enacted to give contractual protection to those retirement benefits <u>already earned as of the date of any amendments to the plan</u>. We recognized the authority of the Legislature to amend a retirement plan prospectively, <u>so long as any benefits tied to service performed prior to the amendment date are not lost or impaired.</u>

*Id.* at 388-89 (emphasis added).

The plaintiffs attempt to distinguish the *Scott* case, stating that the Florida decision is "based upon an analysis of a unique local statutory scheme and a ruling by the Florida courts some years ago." (Doc. 57, p. 17.) They argue that "such a construction of that state's law is quite different from the Alabama statute and law." (Doc. 57, p. 17.) The court does not agree. The changes to the public pension plan in *Smith* are very similar to those in the instant case. The only major difference is that, in *Smith*, the Florida law, in the sense that it contained a clause <u>specifically</u>

creating contract rights, offered more support for the plaintiffs in that case than the statute in the instant case. *Smith* is persuasive for its holding that contract rights were not created, so as to prevent prospective changes, in spite of this language.[41]  Further, the language in the *Florida Sheriffs Ass'n* case, cited approvingly by the court, is consistent with the unmistakability doctrine outlined above, and in the *Smith* case.[42]

The plaintiffs counter the defendants by citing cases of their own where contract rights preventing a change in the contribution level of employees were found.  (Doc. 57, pp. 19-21) (*discussing Marvel v. Dannemann*, 490 F. Supp. 170, 174 (D. Del. 1980); *Ass'n of Pennsylvania State Coll. & Univ. Faculties v. State Sys. of Higher Educ.*, 505 Pa. 369, 375, 479 A.2d 962, 965 (1984); *Wisley v. City of San Diego*, 188 Cal. App. 2d 482, 485, 10 Cal. Rptr. 765 (1961);  *Allen v. City of Long

---

[41]The defendants cite and discuss several more cases which the court will not review here. It is sufficient that the court finds no statutorily-created contractual right to a permanent 6% contribution.

[42]The plaintiffs' argument that the RSA handbook, to the extent that it speaks of "vested rights" creates a contract is also without merit.  The same handbook also states that "The member's contribution rate is determined by statute and subject to change by the Alabama legislature."  (Doc. 47-7, p. 4) (emphasis added).  To the extent that the handbook is a contract, the plaintiffs clearly could not have relied upon it to think that their contribution rate would never change.   "Under these circumstances, an employee's reasonable expectation from the Plan contract cannot include a guarantee that an employee contribution would never be required." *Transp. Workers Union of Am., Local 290 By & Through Fabio v. Se. Pennsylvania Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998) (where the Act expressly contemplated that the provisions of any pension and retirement system created thereunder would be subject to modification from time to time by the Authority's Board and that the employees covered might be required by resolution of the Board to make contributions).

*Beach*, 45 Cal. 2d 128, 131, 287 P.2d 765 (1955); *Singer v. City of Topeka*, 227 Kan. 356, 363, 607 P.2d 467, 473 (1980).   However, all of their cases, in addition to being decided in other jurisdictions, were decided <u>prior</u> to the Supreme Court's decision in *National R.R. Passenger Corp*.   None of the plaintiffs' cited cases analyzed whether the enactment at issue manifested a   "clear" or "unmistakable" intent to create a contract, which is the standard announced by *National R.R. Passenger Corp*.   Under these circumstances, the court does not find the cases cited by the plaintiffs to be persuasive.   *See, San Diego Police Officers' Ass'n v. San Diego City Employees' Ret. Sys.*, 568 F.3d 725, 740 (9th Cir. 2009) (in the public pension context refusing to find persuasive decisions "where the court . . . did not acknowledge the heavy burden on a plaintiff to 'overcome [the] well-founded presumption' . . . that a legislative body does not intend to bind itself contractually, nor did it look to the legislative body's intent to create vested rights").

In their brief in support of their motion for summary judgment, the plaintiffs cite three Alabama cases which they contend recognize vested or contractual rights under the ERS plan.   Although the court must make its own decision as to whether contract rights are created, the court also must accord "respectful consideration and great weight to the views of the State's highest court...." *Romein,* 503 U.S. at 187, (quoting *Brand,* 303 U.S. at 100, 58 S.Ct. 443).   The court is unpersuaded by these

cases as well; first, because they also were decided prior to *National R.R. Passenger Corp.*, and also because, as shown below, they are not on point.

In *Smith v. City of Dothan*, 279 Ala. 571, 188 So. 2d 532 (1966), a City of Dothan employee had voluntarily contributed to the City's retirement system 5% of his salary until he became eligible to retire. *Smith*, 188 So. 2d 533. Before he retired, the City amended the plan and changed future deductions to 5% of the first $4,800 earned annually, "thereby reducing monthly pension amounts payable under the plan." *Id.* at 534. When the plaintiff later sought to retire, he complained that he had a vested right to benefits paid on 5% of his entire salary for the entire time he worked.[43] *Id.* After reviewing several cases, the Alabama Supreme Court held: "It is our opinion in the instant case, under the agreed statement of facts, that appellant, upon reaching eligibility for retirement in 1959, acquired a vested right to the [original] benefits . . . free of the amendment." *Id.* at 536.

*Smith* is distinguishable from the instant case because it dealt only with the issue of whether <u>benefits</u> vest at a certain point, not whether an employee could be made to <u>contribute</u> more for the <u>same</u> benefit. Indeed, the Alabama Supreme Court

---

[43] The plaintiff stated that he was "ready, able and willing to pay into the retirement fund five per cent of his salary above the $4800 if it should be determined he is entitled to draw retirement pay . . . without the amendment." *Smith*, 279 Ala. 571, 574, 188 So. 2d 532, 534 (1966).

was clear in *Smith* that its decision should not be read to foreclose what has occurred

in the instant case, saying:

> We . . . pretermit discussing a situation that denies the Legislature the
> right to pass reasonable legislation to keep the pension systems of
> municipalities flexible and actuarially sound <u>by either requiring
> increased contributions from employees</u> or reasonable reductions in
> pensions not yet due and payable to employees not yet entitled to be
> retired either for disability or length of service. Such a situation could
> result in some pension funds 'running dry' with future pensioners left
> without any funds from which the pensions could be paid, although they
> had contributed such funds during their entire employment by the
> municipality involved.

*Id.* at 536 (emphasis added).

The plaintiffs also cite *Snow v. Abernathy*, 331 So. 2d 626, 631 (Ala. 1976).

In that case, Snow was a voluntary member of the ERS. When he became a member,

the law provided that, should a member die before retirement, the amount of his

contributions "with such interest as would have been returnable in the case of

withdrawal as provided in paragraph (a) of this subsection shall be paid to his estate,

or to such person as he shall have nominated by written designation duly executed

and filed with the board of control." *Id.* at 628. When Snow elected to become a

member of the system in 1947 he designated his first wife as his beneficiary. *Id.* He

then divorced her in 1965 and changed his beneficiary from her to his estate. *Id.* In

1966, Snow then married his second wife, the plaintiff in the case. *Id.* at 628-629.

In 1967, the Alabama legislature amended the system by designating the surviving

spouse as beneficiary to whom contributions would be returned and adding a surviving spouse benefit. *Id.* at 629. Snow died in January 1974. *Id.* at 629. His second wife then filed for return of her deceased husband's contributions with accumulated interest (as provided for under the 1967 Amendment) and also filed for the surviving spouse benefit that was created by that Amendment.

The court held that Snow acquired "vested contractual rights" to receive all benefits "contracted for" and included the power to designate his beneficiary, writing:

> That right was provided by [the Act of the legislature]; the basis of the contractual agreement at the time of Snow's election to participate. By electing, expressly or by assent, to participate in such plan employees acquire vested rights of contract to the benefits provided therein upon acceptance of the plan. Those rights may not be impaired by subsequent legislation.

*Id.* at 631 (emphasis added). Again, the *Snow* case dealt with legislation which abridged a benefit. It did not deal with the issue in this case; whether the employee's required contribution to a plan could be increased without increasing benefits.[44]

In *Bd. of Trustees of Policemen's & Firemen's Ret. Fund of City of Gadsden v. Cary*, 373 So. 2d 841, 842 (Ala. 1979), the Alabama Supreme Court held that even involuntary participants in a public retirement plan can acquire contractual rights to

---

[44]The *Snow* case also did not stand for the proposition that no changes could ever be made holding that "legislation to improve the system is constitutionally permissible." *Snow*, 331 So. 2d at 631.

benefits, stating:

> We hold that without regard to whether a public retirement plan is mandatory or voluntary, where employees have served and retired, the <u>benefits</u> to which they are entitled may not be reduced subsequent to their retirement absent an express reservation of a right to amend at any time.

*Bd. of Trustees of Policemen's & Firemen's Ret. Fund of City of Gadsden v. Cary*, 373 So. 2d 841, 842 (Ala. 1979) (emphasis added).  In language similar to that used by the First Circuit in *McGrath*[45], the court wrote:

> We analogize this situation to a unilateral contract, where the promisee has completely performed all of the obligations and all conditions precedent so that the promisor has an unqualified duty to pay those obligations. We are of the opinion that subsequent legislative alteration is barred by Art. 1, § 22 of the Alabama Constitution of 1901.

*Cary*, 373 So. 2d at 842.  Again, whether the plaintiffs here have contract rights to <u>benefits</u> is not an issue.

The court decides this case, as it must, based upon the language of the statutes cited by the plaintiffs.  None of these statutes evidence that the legislature unmistakably intended to create contract rights when it established the initial contribution rate at 6%.  As the *Parker* court noted, "[e]ven if we treat the statute as unclear . . . we think that the principle of unmistakability would defeat the . . . claim that the contract rights are created when service requirements are satisfied." *Parker*,

---

[45]Discussed *supra* p. 78.

123 F.3d at 9.

> **(4)      Do the Actions of the City of Gadsden in Merging the PFRF into the ERS Create Contract Rights in Favor of the Plaintiffs So As To Prevent the Increase in the Contribution Rate?**

The defendants' motion for summary judgment argues:

> Plaintiffs have suggested in prior proceedings and discovery that when the old police and fire pension fund was merged into ERS, that they had an "agreement" that their contribution rate would never go up once they finished paying thirty-five months of a supplemental five percent (5%) payment. There is no evidentiary support for this proposition, however. None of the plaintiffs nor their witnesses has testified to any representation by the City that their contribution rates would [not] increase. There are no documents showing this. Instead they have stated that such was their "understanding," based on the fact that the statutory rate had not increased ever before (that they knew of).

(Doc. 51, pp. 51-52.)

In response, the plaintiffs' entire argument is:

> Plaintiffs have submitted a complete evidentiary record of the process in 2000-02 of negotiating an agreement for the merger of the former PFRF into the ERS. See, doc. no. 49, pp. 4-6, 8-10, 20-44. Those facts plainly demonstrate that Gadsden agreed with the plaintiffs in 2002 that the PFRF would merge with ERS in 2002 and the employees would pay the ERS contribution rate of 6%. In addition, as a quid pro quo, the employees agreed to contribute an additional 5% for three years to the "Supplemental Fund" as their agreed contribution to reduce the unfunded liability. We now know that Gadsden did not apply those additional funds to its unfunded liability from the old fund. Rather, Gadsden put the money in its general fund as an offset of the costs Gadsden otherwise had to pay in 2003-2005. Gadsden and the employees also agreed that the employees rate of contribution would revert to the State's default rate of 6% in 2006. Gadsden now has

unilaterally opted to increase that rate to 8.5% and claims its unfunded liability as an excuse for doing so.

Gadsden made an agreement in 2002 that was plainly embodied in the 2002 ordinances and resolutions it adopted. A full evidentiary record of the negotiation of that agreement is in the record. There was a quid pro quo and the employees complied. And, the agreement provided that after 2005 the employees would pay the regular statutory contribution rate. That default statutory contribution rate is still 6%. Some 800 localities continue to adhere to that default rate.

Gadsden's unilateral action to increase the rate in August 2011 from the statutory default rate was a plain violation of the contract it made with its employees when the City and employees both voted to approve the ERS merger.

(Doc. 57, pp. 25-26.)

First, the general citation to the plaintiffs' brief in support of their own motion is insufficient.  The citation of pages 4-6 of document 9 is properly objected to by the defendants, as it is a "factual overview," or a summary of sorts of the plaintiffs' version of the facts.  The remaining sections are citations to several hundred facts proffered by the plaintiffs, some of which have nothing to do with this issue and others of which have been excluded by the court.  The plaintiffs cite to no argument or analysis of this issue in document 49.  Indeed, the plaintiffs did not make an argument on this issue in their own motion.

The court is under no independent obligation to develop grounds in opposition to summary judgment on behalf of the plaintiffs as "the onus is upon the parties to

formulate arguments[.]" *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted); *see also id.* ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.") (citation omitted)).

That being said, there seems to be no dispute that the parties agreed to suspend the additional 5% payment by the plaintiffs after three years.  However, the plaintiffs point to no evidence, nor do they even argue, that the City agreed to never raise the contribution rate on the firefighters again.[46]

Further, the evidence shows that not only was there no agreement, the issue was never even discussed.  Smith testified that there was never a discussion about a rate increase.  (Doc. 47-8, p. 24.)  Matlock testified that he does not remember whether an increase in the future contribution rate was actually ever discussed by either City officials or ERS officials.  Harrelson states that, at none of the meetings he attended, was there any representation that the ERS employee contribution rate would or would not increase. Taylor says that during the discussions in which he participated, there was no discussion or contemplation, by anyone, that the ERS employee contribution rate would change.  Morris remembers discussions about

---

[46]Indeed, they "acknowledge that the law does not provide that the state may *never* lawfully alter such obligations."  (Doc. 49, p. 60) (emphasis in original).

merging the old fund into the ERS, but does not remember any discussion of whether the base contribution rate would change.

Finally, even if there were such an agreement, in Alabama "[c]ontracts entered into by a municipality shall be in writing." *Alford v. City of Gadsden*, 349 So. 2d 1132, 1134 (Ala. 1977); Ala. Code § 11-47-5. There is no evidence of any writing whereby the City of Gadsden agreed to never increase the percentage paid by firefighters. Even if the plaintiffs had contended, which they do not, that the ordinances of the City Council memorialize the contract, none of those ordinances state that the amount of the contribution will <u>never</u> be increased.

### (5)   No Contractual Rights Were Created

In short, the court sees only one agreement here. The City, for its part, agreed to take the firefighters out of their old pension system and into the ERS along with the large unfunded liability of the ERS. The firefighters agreed to pay towards their ERS pension what other hazardous duty employees were paying, 6%. In addition, the firefighters agreed to pay an additional 5% for three years, after which time, and this is key, the 5% additional contribution would cease. The result was, and is, that after the three years, the firefighters would only pay <u>what every other state and municipal employee in the ERS was paying</u>.

> c.   **If There Was a Contract, and the Change in the Law Impairs That Contractual Relationship, Was the**

96

**Impairment Substantial?**

The defendants next argue that, if a contract exists, any impairment that the rights created in that contract was not substantial.  (Doc. 51, p. 43.)  In their response brief, the plaintiffs write:

> First, defendants say nothing to support the notion that a 40% increase in the employees' contribution to their pension is not substantial. The terms of the merger with ERS were negotiated over a two year period. And the amount of the employees' contributions was an important and critical part of the negotiation process. The facts of that process are fully documented in the depositions of the employee negotiators, former Mayor Means and the other City officials involved. Nobody that testified suggested the amount of the increase was insubstantial.

(Doc. 57, p. 27.)  In their brief in support of their motion for summary judgment the plaintiffs write, without citation to authority,

> [b]y raising the contribution rates of employees who already hold vested pension rights with more than ten years of service, Gadsden substantially altered enforceable contractual interests. Those employees now have to pay 8.5% of their salary to maintain their already vested pension rights, rather than 6%.

(Doc. 49, p. 60.)  The court does not agree.

A "substantial impairment" can be the "total destruction of a contract." *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 431, 54 S.Ct. 231, 237, 78 L.Ed. 413 (1934).  However, the Supreme Court has recognized that "the actual line between permissible and impermissible impairments could well be drawn more narrowly." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 27, 97 S. Ct. 1505,

1520, 52 L. Ed. 2d 92 (1977).  The extent of the impairment is only one "relevant factor in determining its reasonableness".  *U.S. Trust Co.*, 431 U.S. at 27.  "[T]he Supreme Court [also] looks at whether the impaired term was central to the contract, whether settled expectations have been disrupted, and whether the impaired right was reasonably relied on." *Honeywell, Inc. v. Minnesota Life & Health Ins. Guar. Ass'n*, 110 F.3d 547, 558 (8th Cir. 1997) (Loken, J, concurring opinion) (*citing El Paso v. Simmons*, 379 U.S. 497, 514, 85 S.Ct. 577, 586–87, 13 L.Ed.2d 446 (1965); and *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S. Ct. 2716, 2722, 57 L. Ed. 2d 727 (1978)).

The plaintiffs have not shown or argued that keeping the employee compensation rate at 6% for firefighters <u>forever</u> was a central part of either their agreement to enter into the ERS in the first place, or to pay for three years an additional 5% toward the unfunded liability of the PFRF.  Further, the RSA Handbook in existence in 2002, which the plaintiffs cite as forming part of the contract, states that "[t]he member's contribution rate is determined by statute and <u>subject to change by the Alabama legislature</u>."  (Doc. 47-7, p. 4) (emphasis added). "Under these circumstances, an employee's reasonable expectation from the Plan contract cannot include a guarantee that an employee contribution would never be required." *Transp. Workers Union of Am., Local 290 By & Through Fabio v. Se.*

*Pennsylvania Transp. Auth.*, 145 F.3d 619, 622 (3d Cir. 1998) (where the Act expressly contemplated that the provisions of any pension and retirement system created thereunder would be subject to modification from time to time by the Authority's Board and that the employees covered might be required, by resolution of the Board, to make contributions).

### d.     Were the Legislature and the City of Gadsden Justified in Enacting the Changes?

As shown above, a law or regulation that substantially impairs a contractual relationship does not violate the Contract Clause so long as it serves a significant and legitimate public purpose, is based on reasonable conditions, and is appropriate to the public purpose justifying its enactment. *Davken*, 366 Fed. App'x at 41 (citing *Energy Reserves Grp.,* 459 U.S. at 411-12). However, the court does not need to reach this issue, as it has already found no contract, and, even if there were a contract, the court has found that the plaintiffs' rights in the contract were not substantially impaired.

### 3.     *Summary Judgment for the Defendant*s

Based on the foregoing, the defendants' motion for summary judgment will be **GRANTED**, and the plaintiffs' motion for summary judgment will be **DENIED**.

## III.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED, ADJUDGED**, and

**DECREED** as follows:

1.      The plaintiffs' motion to strike is **GRANTED**.  The entire affidavit of Lisa

Rosser, and the quoted portion of the Diane Scott deposition are **STRICKEN**.

2.      The defendants' motion for summary judgment is **GRANTED**.

3.      The plaintiffs' motion for summary judgment is **DENIED**.

By separate order, this case will be  **DISMISSED, with prejudice**, costs taxed

as paid.

**DONE** and **ORDERED** this 29th day of July, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge